Brock Purviance, *In pro per*
Register Number 34230-013
c/o Federal Correctional Institution
1900 Simler Avenue, S-1
Big Spring, Texas 79720

*In propria persona* for Defendant-Petitioner



RECEIVED

JAN 1 4 2008

CLERK, U.S. DISTRICT COURT
ANCHORAGE, A.K.

# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | |
|---|---|
| **BROCK PURVIANCE,** | § Case Number: _____ |
| | § Related to:   (3:06-cr-0040-JWS) |
| Defendant-Petitioner | § |
| | § **MEMORANDUM OF POINTS AND** |
| versus | § **AUTHORITIES IN SUPPORT OF** |
| | § **DEFENDANT-PETITIONER'S MOTION** |
| **UNITED STATES OF AMERICA,** | § **UNDER 28 U.S.C. § 2255 TO VACATE, SET** |
| | § **ASIDE, OR CORRECT SENTENCE OF A** |
| Plaintiff-Respondent. | § **PERSON IN FEDERAL CUSTODY** |
| | § |

NOW COMES, the Defendant-Petitioner, BROCK PURVIANCE (hereinafter "Petitioner"),

*in propria persona*, to present the following points and authorities in support of his motion under

U.S.C. § 2255 to vacate, set aside, or correct sentence of a person in federal custody.

# TABLE OF CONTENTS

## I. BACKGROUND

## II. DISCUSSION

    a. Petitioner was deprived the effective assistance of counsel as required under the Constitution of the United States

        1. **GROUND ONE:** COUNSEL FAILED TO MAKE AN OBVIOUS MERITORIOUS ARGUMENT AT SENTENCING THAT WOULD HAVE PROVEN THAT JH WAS NOT UNDULY INFLUENCED

        2. **GROUND TWO:** COUNSEL FAILED TO INTERVIEW AND CALL AN ESSENTIAL MATERIAL WITNESS AT SENTENCING WHO WOULD HAVE PROVIDED EXCULPATORY TESTIMONY IN REGARD TO ENHANCEMENT CONDUCT

        3. **GROUND THREE:** COUNSEL ALLOWED PETITIONER TO BE DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO CONFRONTATION AND CROSS EXAMINATION OF A WITNESS AGAINST HIM AT SENTENCING

        4. **GROUND FOUR:** COUNSEL FAILED TO CHALLENGE INACCURATE INFORMATION IN PETITIONER'S PRESENTENCE REPORT AND AT SENTENCING

        5. **GROUND FIVE:** COUNSEL FAILED TO CALL A WITNESS WHO WOULD HAVE PROVIDED POWERFUL REBUTTAL TESTIMONY TO THE GOVERNMENT'S MISREPRESENTATION THAT PETITIONER WAS ILL-INTENDED AND "MANIPULATIVE"

        6. **GROUND SIX:** COUNSEL FAILED TO ASK THIS HONORABLE COURT TO RECOMMEND THE BOP'S RDAP PROGRAM FOR PETITIONER

        7. **GROUND SEVEN:** COUNSEL DEPRIVED PETITIONER OF HIS RIGHT TO A DIRECT APPEAL

        8. **GROUND EIGHT:** COUNSEL FAILED TO FUNCTION IN THE ROLE OF AN ADVOCATE BY RELYING ON A DEFENSE STRATEGY UNSUPPORTED BY FACT OR CASE LAW

    b. **GROUND NINE:** The Government willfully suppressed information favorable to and requested by petitioner

## TABLE OF CONTENTS (cont.)

**III. CONCLUSION**

**IV. EXHIBITS**

      A.  Declaration of Brock Purviance

      B.  JH's (Initial) Statement to the FBI (excerpt)

      C.  JS's Statement to the FBI (excerpt)

      D.  Letter from JH to Petitioner During August 2004 Visit

      E.  Letter from JS to Petitioner During  August 2004 Visit

      F.  Letter from JH to Petitioner After August 2004 Visit

      G.  Letter from JH's counselor

      H.  Affidavit of Jared Jurgensmeier (in Petitioner's property, see closing **WHEREFORE** statement)

      I.  Affidavit of Janet S. Muñoz

      J.  Affidavit of Frederick G. Muñoz

# I. BACKGROUND

On August 18, 2004, Petitioner traveled interstate to pursue a consensual intimate relationship with Petitioner's minor girlfriend (hereinafter "JH"). Petitioner was subsequently charged with one count of travel with intent to engage in illicit sexual conduct, under 18 U.S.C. § 2423(b). The Government offered Petitioner a plea agreement which recommended a sentence of 57 – 71 months under the United States Sentencing Guidelines.[1]

Petitioner discussed this plea agreement with his counsel and took issue with the undue influence enhancement. Petitioner explained that JH was not "unduly influenced", and that JH, along with JH's best friend (hereinafter "JS") should be called to testify to that fact. Petitioner also reminded Counsel of the favorable, if not exculpatory, statements JH and JS had already made to the FBI in regard to said enhancement conduct. Counsel agreed that at least the key witness, JH, would be called to testify at sentencing. Petitioner expressed further concern that the undue influence enhancement appeared to be "agreed to" in the plea agreement. Counsel assured Petitioner that this was not an issue of concern and that Counsel would argue against the enhancement at sentencing. On Counsel's representation that (1) the undue influence enhancement would be argued at sentencing and (2) Counsel would call JH to testify at sentencing, Petitioner executed the agreement.

After Petitioner changed his plea, Counsel informed him that the Government indicated that JH had been interviewed by the FBI at least one more time after the FBI's initial interview with her. Suspecting the subsequent interview(s) may have contained additional favorable statements regarding the undue influence conduct (as were found in the transcriptions of the initial interviews with JH and JS), Petitioner's counsel requested transcriptions of the new interview(s). The Government failed to comply, nonetheless, respond, to said request.

---

[1] This sentence was calculated with a base offense level of 24, plus two points for use of a computer, plus two points for "undue influence", minus three points for acceptance of responsibility, for a total offense level of 25.

When reviewing Petitioner's presentence report ("PSR"), Petitioner stated that Counsel should object to the undue influence enhancement in the sentencing calculation as Petitioner did not want the enhancement to appear "agreed to". Counsel made no such objection. Petitioner told Counsel that the statements of JH's mother (hereinafter "KH") in paragraph 27 regarding Petitioner's phone conversations with KH were largely inaccurate. Petitioner provided a recount of what was actually said, insisting an objection be filed. Counsel filed no such objection.

Petitioner insisted that Counsel call Jared Jurgensmeier ("Jurgensmeier"), a close friend of Petitioner for 20 years, to testify about Petitioner's genuine affection toward JH, that Petitioner spoke of marrying and spending his future with JH, and that Petitioner's efforts in writing and calling KH were sincere motions for peaceful resolution, to rebut Government's arguments that Petitioner was "grooming" JH and was manipulative toward KH.[2] Jurgensmeier could have also testified about Petitioner's abuse of alcohol and marijuana. Counsel spoke with Jurgensmeier and subsequently informed Petitioner that Jurgensmeier would be called to testify at sentencing.

Immediately before sentencing, Counsel informed Petitioner and Jurgensmeier that Counsel had not yet contacted JH, and that contrary to Counsel's prior representation, Counsel would not call JH to testify. Counsel explained to Petitioner that Counsel did not know how JH would testify and thus, calling JH to testify was inherently a bad idea. Petitioner reiterated his insistence on calling JH to testify and pointed out: (1) JH had already given favorable, if not exculpatory, statements to the FBI regarding enhancement conduct; (2) a counselor who had been working with JH for approximately six months had recently reported that JH showed "tremendous allegiance and commitment" to Petitioner; (3) JS, who had also already given favorable, if not exculpatory, statements to the FBI regarding enhancement conduct, would state how JH would testify and would

---

[2] These arguments had already been presented by the Government at Petitioner's bail hearing; they were made in paragraph 13a of Petitioner's PSR; and they were anticipated to be made at Petitioner's sentence hearing.

testify herself in support of Petitioner's position; and (4) Petitioner was certain that JH's testimony would be both truthful and favorable.  Counsel still refused to call JH to testify at sentencing.

Petitioner explained to Counsel that it was essential to make the Court aware that telephone, not e-mail, was vastly the primary medium of Petitioner and JH's communication.  This fact could easily be proven by reviewing Petitioner's phone bills and presenting them to the Court.  At that point, the Court would understand that to make decisions solely based on (out-of-context) statements made in e-mails would be unfair to Petitioner, as those statements, in no way, could accurately be considered definitive (beyond in and of themselves) or comprehensive.  Counsel refused to review Petitioner's phone bills.

Petitioner was thereafter sentenced without available exculpatory evidence regarding the undue influence enhancement conduct (i.e. JH's and JS's statements to the FBI that Petitioner and JH's relationship was entirely consensual, and letters from both JH and JS to Petitioner which clearly affirm that Petitioner and JH's relationship was loving and consensual); without proving to the Court – or even making the Court aware – that the vast majority of Petitioner and JH's communication was telephonic, and that e-mail, at all points in Petitioner's and JH's relationship could not fairly be considered conclusively comprehensive documentation of any conversed subject; without testimony from Jurgensmeier to make clear to the Court Petitioner's genuine feelings toward JH, Petitioner's good-hearted intentions in writing and calling KH, and to bring to light Petitioner's alcohol and marijuana abuse; without asking the Court to recommend the Bureau of Prisons' ("BOP") residential drug and alcohol program ("RDAP"); and most damagingly, without the key testimony from JH that would have made clear to this Honorable Court that JH was not unduly influenced.  As a result, Petitioner's sentence was not only increased with the undue influence enhancement, but Petitioner also received the top of his guideline sentencing range.

In a meeting in the court building directly after sentencing, Petitioner told his counsel that he wanted to appeal, stating that he felt had JH been called to testify he would not have received the enhancement for undue influence as well as the top of his sentencing guideline range. Counsel agreed that not calling JH to testify was "probably an appealable issue". Counsel went on to explain that Petitioner would receive a higher sentence upon reconsideration of the issues already presented if he appealed, and that Counsel thought it was a "bad idea". The meeting was abruptly ended by the U.S. Marshals. Afterward, Petitioner made repeated efforts to meet with counsel as Petitioner still wanted to appeal. Counsel afforded Petitioner no such meeting. Petitioner had also indicated to his parents, who were in Anchorage for his sentencing hearing, and to Jurgensmeier (via phone) that he was going to appeal. Counsel, however, ignored Petitioner's request and did not file notice of appeal before Petitioner's 10-day time limit to appeal expired.

## II. DISCUSSION

This presentation is comprised of many arguments inextricably intertwined with Fifth and Sixth Amendment violations, varying in degree of ill-effect: Petitioner was deprived of effective assistance of counsel when Counsel (1) failed to make an obvious meritorious argument at sentencing that would have proven Petitioner's innocence in terms of enhancement conduct, (2) failed to interview and call an essential witness at sentencing who would have provided exculpatory testimony in regard to enhancement conduct, (3) allowed Petitioner to be deprived of his right to be confronted with the witnesses against him and allowed testimonial evidence without cross examination at sentencing, (4) failed to make objections to inaccurate statement made in Petitioner's PSR and failed to raise these issues at sentencing, (5) failed to present mitigating evidence at sentencing, (6) failed to ask the Court to recommend the BOP's RDAP program at sentencing, and (7) failed to file an appeal as directed by Petitioner, depriving Petitioner of his right to an appeal; and the Government suppressed evidence favorable to and requested by Petitioner. Even if the Court does not find any of the aforementioned issues sufficiently prejudicial individually, their cumulative effect is certainly so prejudicial as to require vacatur of Petitioner's sentence and allow Petitioner to be resentenced.

As a *pro se* habaes petitioner unlettered in the law, Petitioner asks to be afforded the benefit of any doubt in the liberal construction and resolution of his claims. See *Brown v Roe*, 279 F.3d 742, 745-46 (9th Cir. 2002).

a.  Petitioner was deprived the effective assistance of counsel as required under the

Constitution of the United States.

The standard for determining ineffective assistance of counsel claims is set forth in *Strickland v*

*Washington*, 466 U.S. 866 (1971), requiring a two prong cause/prejudice analysis.

### 1. COUNSEL FAILED TO MAKE AN OBVIOUS MERITORIOUS ARGUMENT AT SENTENCING THAT WOULD HAVE PROVEN THAT JH WAS NOT UNDULY INFLUENCED

Petitioner's sentenced was increased for "undue influence" under the 2003 United States

Sentencing Guidelines § 2A3.2(b)(2)(B).  At sentencing, Petitioner's counsel noted and the Court

affirmed that there was no case law on the undue influence enhancement.  Sentencing Transcript, p.

28 at 12-13.  At present day, there is no Ninth Circuit case law on the undue influence enhancement.

Therefore, this is a case of first impression in the Ninth Circuit.

To determine whether the undue influence enhancement applies, the Eleventh Circuit, in

*U.S. v Bitsilly*, 386 F.Supp. 2d 1192 (2005), relied on the following three criteria (referred to as "types

of power"): "displaying an increased knowledge to influence the minor, using persuasive powers to

influence the minor, and using superior resources to influence the minor".  *Id.* at 1196.  The *Bitsilly*

court determined the undue influence enhancement was not appropriate as the defendant's behavior

did not reflect abuse of the noted "types of power".

*Bitsilly* and Petitioner's case are analogous in terms of said enhancement conduct.  The

primary differences between *Bitsilly* and Petitioner's case are in *Bitsilly*:  the age difference between

Bitsilly and the minor was 20 years (as opposed to Petitioner's and JH's 13 year age difference); the

minor was pregnant; and the minor's family was supportive of the defendant's relationship with the

minor.  None of these differences speak to the aforementioned criteria determinant of undue

8

influence. The similarities, however, are vast and entirely relevant to the conduct considered in

determining whether the minor was unduly influenced:

> "From the beginning, the Defendant and [minor] engaged in a consensual relationship. [Minor] did not report Defendant to police[.]   [Minor] never stated that Defendant is violent or abusive in any way[.]  She said that Defendant did not force her to have sexual intercourse with him; *it was a joint decision*."

*Id.* at 1196 (emphasis added).

Drawing a parallel, in Petitioner's case the following facts are uncontested: Petitioner and JH

engaged in a consensual relationship; JH did not report Petitioner to the police or FBI; and JH never

stated that Petitioner was violent or abusive in any way.  In an interview with the FBI on March 21,

2006, JH made clear that Petitioner did not force her to have sexual intercourse with him, but, rather

that it was a *joint decision*:

> "Around [June of 2004], [JH and Petitioner] began discussing [Petitioner] taking a trip to Alaska to meet [JH] in person. *The two decided* [Petitioner] would travel to Alaska, but had not decided on a specific date. Also around this time, June and July of 2004, [JH] and [Petitioner] talked about the two of them having sex, and [JH] knew that when [Petitioner] did come to Alaska, the two of them would engage in sexual intercourse. When asked by the interviewing agent how she knew this, [JH] stated she knew this because *she and [Petitioner]* "planned it to happen" upon his arrival in Alaska.   [JH] reported the [sic] she and [Petitioner] had *consensual* sex[.]"

Exhibit "B" (emphasis added).  Compounding JH's statement, JS, in an interview with the FBI on

March 21, 2006, stated, "[JH] knew that she and [Petitioner] would have sex with [Petitioner] arrived,

and the sex between them was *consensual*.".   Exhibit "C" at ¶ 2 (emphasis added).

Furthering the fact Petitioner and JH's relationship, like the relationship in *Bitsilly*, was

"motivated by love, not abusive behavior"[3], in a letter given to Petitioner shortly before Petitioner left

Alaska in 2004, JH wrote:

> "I love you so much, and I've loved the time we spent together[.]  I'm going to miss being able to kiss you, talk to you, and just spend time together in general[.]  Everything went so well."

---

[3] *Bitsilly* at 1193.

Exhibit "D" at ¶¶ 1-3.  In a like letter to Petitioner, JS wrote, "Anyway, I really hope things end up working out for you two.  Ya guys make an awesome couple.".  Exhibit "E" at ¶ 2.  When saying her final "goodbye" to Petitioner in August 2004, JH described the week Petitioner and JH spent together as "the happiest week of [her] life".  Exhibit "A" at 8.  And in a letter JH wrote to Petitioner shortly after Petitioner's 2004 visit to Alaska, JH reflected, "I enjoyed spending time with you and just being with you overall.[ ]   Just a lot of good memories.     :)".  Exhibit "F" at ¶ 2.  Of the situation's unique circumstance, the *Bitsilly* court commented:

> "These extraordinary facts separate Defendant's case from so many of the other sexual abuse cases that the Court regularly sees[.]  The instant case presents a much different picture.  [Minor] and Defendant clearly are in love and miss one another[.]  I do not believe that the Sentencing Commission contemplated such a situation when formulating the relevant Guideline provision."

*Bitsilly* at 1196 and 1198.

Given the criteria established in *Bitsilly*, the foregoing should make clear that Petitioner's sentence should not have been enhanced two points for undue influence.  Petitioner asserts Counsel, who had access to *Bitsilly*, JH's and JS's (initial) statements to the FBI, as well as the letters JH and JS wrote to Petitioner while Petitioner was in Alaska in 2004 and the letter JH wrote to Petitioner after his 2004 visit, was ineffective as Counsel's performance did not fall in the range of competence demanded of attorneys in criminal cases in that Counsel failed to present this clearly meritorious, colorable, and obvious argument to the Court at sentencing.  As a result, Petitioner's sentence was prejudiced with the two-level enhancement for undue influence.  In a recent case where similar ineffective assistance of counsel allegations were asserted, the Ninth Circuit established:

> "We have held that a lawyer who fails[ ] to introduce into evidence,  evidence[ ] that raises sufficient doubt as to that question to undermine confidence in the [outcome] renders deficient performance."

*Riley v Payne*. 352 F.3d 1313, 1319-20 (9th Cir. 2003) (internal quotation removed).  For this reason alone, Petitioner's sentence should be vacated and Petitioner should be resentenced in light of the foregoing information.

### 2. COUNSEL FAILED TO INTERVIEW AND CALL AN ESSENTIAL MATERIAL WITNESS AT SENTENCING WHO WOULD HAVE PROVIDED EXCULPATORY TESTIMONY IN REGARD TO ENHANCEMENT CONDUCT

A. Phone was Petitioner's and JH's primary medium of communication, not e-mail.  At prior hearings, the Government's arguments regarding Petitioner's conduct toward JH were entirely reliant on statements Petitioner made in e-mails to JH.  Though the statements are undeniable, they are also merely small pieces of a much larger puzzle; and the Government's assertions about these statements were obtuse, and certainly do no reflect the conclusions of anyone who had first-hand knowledge of Petitioner and JH's relationship.  Petitioner knew that the only way his counsel could present a fair and adequate defense was to have JH testify.

Petitioner explained to Counsel that despite the voluminous number of e-mails between Petitioner and JH, telephone was vastly Petitioner and JH's primary medium of communication (followed by internet chat, *then* e-mail).    Exhibit "A" at 11.    At no point did e-mail ever comprehensively document Petitioner and JH's conversations about any topic.  When interviewed by the FBI, JH indicated "[b]y June of 2004, [Petitioner and JH ] were communicating daily, either over the phone or computer". Exhibit "B" at ¶ 1.  A cursory review of Petitioner's phone bills, which Counsel refused, would have revealed that Petitioner and JH spoke for hours daily as the usual communication.  Exhibit "A" at 12.  Had that information been presented at sentencing, it would have been evident that any statement(s) made in e-mail must be considered as out-of-context.  To judge undue influence enhancement conduct in the present case solely based on statements in e-mail

would be akin to judging an entire puzzle by a few of its small pieces: while the pieces may make an impression, a resulting opinion of the entire puzzle certainly could not be rendered with confidence.

B. JH was the critical witness who would have provided conclusive testimony (the "missing pieces") essential to the defense proving that JH was not unduly influenced . Petitioner signed his plea agreement on Counsel's representation that JH would be called to testify at sentencing. Exhibit "A" at 4, Exhibit "J" at 3, and Exhibit "K" at 2. It is axiomatic that a defense counsel has a responsibility to interview material witnesses in criminal cases. As stated by the Supreme Court,

> "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular decisions unnecessary."

*Strickland* at 691. A couple of days before sentencing, Counsel told Petitioner that JH would not be called to testify at sentencing. Exhibit "A" at 5, Exhibit "I" at 4, and Exhibit "J" at 3. Counsel attempted to justify to Petitioner why Counsel would not call JH to testify, explaining that it was unknown what JH would say. Exhibit "A" at 5. Counsel's excuse must fail. As stated in *Riley*:

> "Having never interviewed [the material witness], [Counsel] could not have determined what [the material witness] would have said [,] whether [the material witness] would have been a credible defense witness, and whether [the material witness] should have been called to testify to aid the defense[.]"

*Id.* at 1319.

Unlike the defense counsel in *Riley*, however, Counsel had several significant indicators that the material witness, JH, would testify favorably: (1) JH had already made clear that her relationship with Petitioner was consensual[4]; (2) JS also had made clear that Petitioner's and JH's relationship was consensual[5]; (3) JS would have indicated how JH would have testified (and may have also proven to be a valuable witness for the defense); (4) a counselor who had been working with JH for approximately six months had recently reported that JH showed "tremendous allegiance and

---

[4] Exhibit B.
[5] Exhibit C.

commitment to Petitioner"[6];  (5) Petitioner was certain that JH's testimony would have been both "truthful and favorable"[7];  and (6) if the Government knows of the existence of an available witness on a material issue and such a witness is within its control, and if, without satisfactory explanation, the Government fails to call that witness, the inference that the testimony of that witness would not have been favorable to the Government may be drawn. See *State v Leecan*, 91 L.Ed.2d 550 (1986); *Culbertson v The Steamer Southern Belle*, 15 L.Ed 493 (1856). Or, as stated by the Ninth Circuit:

> "When the [Government] confirmed it would not call [the material witness], this should
> have been a 'red flag' alerting defense counsel that [the material witness] may
> have been useful to the defense."

*Riley* at 1320.  In the present case, the Government clearly had access to JH as JH had been interviewed by the FBI at least two times, yet, without explanation, the Government did not call JH to testify; perhaps even more curious is the fact the Government – after having interviewed JH at least two times – did not present a single statement from those interviews to this Honorable Court at any of the hearings prior to sentencing (or at sentencing).  More than a "red flag", this should have been a map leading Counsel directly to the obvious conclusion that JH would likely have been useful to the defense.

Stated succinctly, "[Counsel] unmistakably did not conduct a reasonable investigation that rendered [the material witness]'s testimony, much less an interview, unnecessary"[8], especially considering Counsel's ample indicators that JH's testimony would have been favorable to Petitioner (including the slam-dunk fact JH and JS had already made clear that Petitioner's relationship with JH was *consensual*); Counsel even acknowledged this when, directly after sentencing, Counsel told Petitioner that Counsel's failure to interview and call JH to testify at sentencing was "probably an appealable issue".   Exhibit "A" at 21.   Therefore, Petitioner's Counsel was ineffective for not

---

[6] Exhibit G at ¶ 3.
[7] Exhibit "A" at 7.
[8] Riley at 1319.

interviewing and calling JH to testify at sentencing; and due to Counsel's ineffectiveness, Petitioner's sentence was prejudiced with the two-level undue influence enhancement. Accordingly, Petitioner's sentence should be vacated, and a hearing should be held to hear from JH, the only person who can conclusively shed light on the "undue influence" issue.

### 3. COUNSEL ALLOWED PETITIONER TO BE DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO CONFRONTATION AND CROSS EXAMINATION OF A WITNESS AGAINST HIM AT SENTENCING

As there is currently no case law definitively addressing whether statements made in e-mail which are later presented in court against a defendant to establish a fact can be considered *ex parte* testimony, the argument to follow may be (another) case of first impression.

The Supreme Court, long ago, asserted that the purpose of the Confrontational Clause is to prevent depositions or *ex parte* statements being used against a defendant in lieu of a personal examination and cross examination of the witness. See *Mattox v U.S.*, 39 L.Ed. 409 (1895). "This open examination of witnesses…is much more conducive to the clearing up of truth." Cf. 3 *Blackstone*, Commentaries at 373 (cited in *Crawford v Washington*, 158 L.Ed.2d 177, 199 (2004)).

As noted by the Supreme Court:

> "A defendant [at sentencing] is entitled to the full panoply of the relevant protections which due process guarantees in criminal proceedings. He must be afforded all those safeguards which are fundamental rights and essential to a fair trial, including the right to confront and cross examine witnesses against him."

*Specht v Patterson*, 386 US 605, 609-10 (1967). Accordingly, a criminal defendant has a fundamental right to confront and cross examine the witnesses against him both during trial and at sentencing.

In *Mason v Yarborough*, 447 F.3d 693, 697 (9th Cir. 2006), the Ninth Circuit, frequently citing *Crawford*, articulated the scope of the Confrontation Clause:

> "The Confrontation Clause guarantees 'the accused the right…to be confronted with the witnesses against him…' U.S. Const. Amend. VI. Thus, as a threshold matter, there must be a 'witness[ ] against' the accused for the Confrontation Clause to be invoked properly. In the most recent Supreme Court precedent, *Crawford* [ ], the Supreme Court considered three possible meanings of this clause. The Court stated that '[o]ne could plausibly read 'witnesses against' a defendant to mean those who actually testify at trial, those whose statements are offered at trial, or something in-between…' The Court ultimately settled on a definition that was 'something in-between' and held ' ' witnesses' against the accused… [means] those who 'bear testimony.' ' ' 'Testimony,' in turn, is typically ' [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' ' "

(internal citations omitted). At sentencing, the Government used e-mails from JH to Petitioner as *ex parte* testimonial evidence to support its argument that JH was unduly influenced. Applying *Mason* to the present case: by admitting JH's words into evidence against Petitioner to "establish or prove some fact", the Government effectively made JH a "witness" against the accused who "beared testimony".

In the event the fact that "[JH] knew, as a result of [her] previous conversations [with Petitioner] regarding the issue that [she and Petitioner] were going to have sex"[9] coupled with JH's and JS's affirmations that JH's relationship with Petitioner was consensual[10] did not stand as sufficient evidence that JH's decision to be intimate with Petitioner was made free of "undue influence" and was a joint decision, confrontation and cross examination of JH would have been necessary to "clear up the truth"[11].

The Supreme Court in *Brookhart v Janis*, 384 US 1, 3 (1966), made clear:

> "If there was a denial of cross examination without waiver it would be a constitutional error of the first magnitude, and no amount of showing of want of prejudice would cure it."

Counsel, by refusing to call JH to testify, as demanded by Petitioner, was ineffective for depriving Petitioner of his constitutional right to confrontation and cross examination of a witness against him at

---

[9] Exhibit "B" at ¶ 2.
[10] *Id* and Exhibit "C" at ¶ 2.
[11] F.3 *Blackstone*, Commentaries at 373.

15

sentencing, which resulted in Petitioner's sentence being prejudiced with a two-level enhancement for undue influence.    Accordingly, Petitioner's sentence should be vacated and Petitioner should be allowed a resentencing with confrontation and cross examination of JH to "clear up the truth" and allow this Honorable Court to hear from the only person who can conclusively shed light on the "undue influence" issue.

### 4. COUNSEL FAILED TO CHALLENGE INACCURATE INFORMATION IN PETITIONER'S PRESENTENCE REPORT AND LATER AT SENTENCING

When reviewing his PSR, Petitioner found many factual inaccuracies within it.    Some objections were filed by Petitioner's counsel, however, against Petitioner's demands, the following items were left unrebutted:

A. The undue influence enhancement was figured into Petitioners' total offense level. Petitioner states, "I did not want the undue influence enhancement to appear 'agreed to' in my presentence report, and asked my counsel to file an objection to its inclusion as part of my total offense level.  Counsel told me it would not appear 'agreed to'.".  Exhibit "A" at 13.  Though, in the end, Counsel did initiate the topic of said enhancement at sentencing, it *was* noted in Petitioner's PSR that Petitioner appeared to "agree to" the enhancement as Counsel made no objection to it in the Defense Sentencing Memorandum.  Counsel's failure to make such an objection may have led the Court to believe that Counsel's attempt to rebut said enhancement at sentencing was a half-hearted, "throw-in" argument.  As a result, Petitioner's sentence was prejudiced with the two-level enhancement for undue influence.

B. KH's recount of her phone conversation with Petitioner was largely inaccurate.  A portion of paragraph 27 of Petitioner's PSR includes KH's recount of her phone conversations with Petitioner.

16

As with KH's numerous "libelous, malicious and threatening"[12] websites against Petitioner, and KH's victim statement at Petitioner's sentencing, said recount is a veritable plethora of inaccurate, sensational rhetoric invented for the purpose of maximizing Petitioner's sentence with utter disregard to truth.  The truth was, Petitioner explained to Counsel, "My objectives in conversing with KH were to personally introduce myself, make clear that I genuinely loved JH and sought to marry and spend the rest of my life with her[13], invite peace with KH (as well as the rest of JH's family)[14], offer to help pay for JH's medical expenses[15], and begin a healthy relationship with KH and the rest of JH's family[16]". Exhibit "A" at 14.  Counsel failed to file said rebuttal in the Defense Sentencing Memorandum, failed to make said rebuttal at sentencing, and also failed to present printouts of KH's many websites which would made clear to the probation officer who prepared Petitioner's PSR (and later at sentencing to this Honorable Court) that KH's statements could not be considered reliable in light of KH's vindictive agenda.  See *U.S. v Corral*, 172 F.3d 714 (9th Cir. 1999), and *U.S. v Huckins*, 53 F.3d 276 (9th Cir. 1995) (holding PSR contained hearsay that lacked sufficient *indicia* of reliability because the testimony was biased and/or motivated to lie).  As a result of these failures, Petitioner's sentence was prejudiced with the consideration of unreliable statements resulting in Petitioner receiving the top of his sentencing guideline range.

In *U.S. v Scrivner*, 114 F.3d 964, 967 (9th Cir. 1997), the Ninth Circuit iterated

> "it is well settled that factual findings in a PSR can be accepted as accurate[ ] if a defendant failed to raise objections at the time of sentencing."

By not challenging these items as demanded by Petitioner in the Defense Sentencing Memorandum (and later, at sentencing), Counsel effectively entered them into the record as "accurate facts" via tacit concession.  The Seventh Circuit held that "[a] district court cannot rely on inaccurate information

---

[12] See Exhibit "H" at 15.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

in sentencing a defendant; a sentence based on inaccurate information must be set aside", *U.S. v Polson*, 285 F.3d 563, 567 (7th Cir. 2002). Therefore, Counsel invalidated Petitioner's sentence by allowing the Court to rely on inaccurate information to render its judgment. Accordingly, Petitioner's sentence should be vacated, and Petitioner should be granted a resentencing in light of the foregoing.

### 5. COUNSEL FAILED TO CALL A WITNESS WHO WOULD HAVE PROVIDED POWERFUL REBUTTAL TESTIMONY TO THE GOVERNMENT'S MISREPRESENTATION THAT PETITIONER WAS ILL-INTENTIONED AND "MANIPULATIVE"

Prior to Petitioner's bail hearing in Alaska, Counsel spoke with Jurgensmeier, a close friend of Petitioner for 20 years, who had known of Petitioner's and JH's relationship since its beginning. Counsel and Jurgensmeier spoke "at least half a dozen times" wherein Jurgensmeier "reaffirmed[ ] that [he knew Petitioner] as well as anyone and would be willing to testify in court (in person or via phone)". Exhibit "H" at 16 (parenthesis in original). Counsel determined that Jurgensmeier would be able to "disprove false statements by others against [Petitioner]" and "assured [Jurgensmeier that Counsel] would be calling [him] to testify during [Petitioner's] bail hearing". *Id*. Jurgensmeier even made arrangements with his employer to receive said call while at work. *Id*. Without notice to Jurgensmeier (or Petitioner), Counsel, offering no explanation, never called Jurgensmeier to testify. *Id*.

At Petitioner's bail hearing in Alaska, in Petitioner's PSR, and at Petitioner's sentence hearing, the Government argued that JH was "groomed" and that Petitioner was "manipulative" toward KH. It is noteworthy that all of the people whom the Government interviewed in the present case (minding that JH, JS, and Kai Esbensen ("Esbensen")[17] had been interviewed by the FBI, and all of whom had a *vast* understanding of Petitioner and JH's relationship spanning the duration of said relationship, as

---

[17] Esbensen is a friend whom Petitioner initially met on the internet in 2002. Esbensen and Petitioner spoke frequently and Esbensen knew of Petitioner and JH's relationship since its beginning.

well as knowledge of Petitioner's efforts to contact KH), the Government relied on out-of-context statements made in email, in asserting absurd conclusions, rather than offering clear statements from JH, JS, and Esbensen.  When weaker and less satisfactory evidence is given and relied on in support of a fact when it is apparent that proof of a more direct and explicit character is within the power of the party, it may be presumed or inferred that the better evidence, if given, would have been unfavorable.  See *Interstate Circuit, Inc. v U.S.,* 83 L.Ed 610 (1939); *Runkle v Burnham,* 38 L.Ed 694 (1894); and *Clifton v U.S.,* 11 L.Ed 957 (1846).   Thus, it may be presumed that the Government, to make its arguments, had to rely on "less satisfactory evidence" in lieu of "better evidence" – JH, JS, and Esbensen's statements to the FBI – which, presumably, would have been unfavorable to the Government's said arguments.

In contrast, Jurgensmeier, a law abiding[18], educated[19] business professional[20] who continues to serve in the United States Air Force as a Captain[21], who went to elementary school, middle school, and high school with Petitioner[22] and "knows [Petitioner] as well as anyone"[23], could have elucidated the truth that (1) Petitioner genuinely loved JH[24] and sought to marry and spend his future with her[25], and (2) Petitioner's efforts in making contact with KH were good-hearted.[26]

To rebut the Government's argument that JH was "groomed", suggesting a motive other than love behind Petitioner and JH's relationship, as was argued at Petitioner's bail hearing in Alaska, in paragraph 13a of Petitioner's PSR, and at Petitioner's sentencing, Jurgensmeier could have provided truthful insight to This Honorable Court that (1) "[Petitioner] spoke highly and only lovingly of JH; [Petitioner] never spoke disrespectfully or lewdly of her.  [Petitioner] frequently spoke of marrying JH

---

[18] Exhibit "H" at 1.
[19] *Id* at 2.
[20] *Id* at 3.
[21] *Id* at 4.
[22] *Id* at 5.
[23] *Id* at 16.
[24] *Id* at 11.
[25] *Id* at 10.
[26] *Id* at 14.

when she turned 18 and spending his future with her."[27], (2) "[Jurgensmeier] had been present when [Petitioner] and JH were on the phone and on the computer instant messaging many times. It was more than clear [Petitioner] and JH both cared very much for each other."[28], and (3) "from knowing [Petitioner] as long and as closely as [he has, Jurgensmeier] can say with certainty that [Petitioner] genuinely loved JH."[29].

To rebut the Government's argument that Petitioner was "manipulative" toward KH, suggesting a motive other than genuine hope of creating peace and a healthy relationship with KH as well as the rest of JH's family, which was made at Petitioner's bail hearing in Alaska, in paragraph 36 of Petitioner's PSR, and at Petitioner's sentencing, Jurgensmeier could have provided further truthful insight to this Honorable Court that (1) "Throughout the duration of his relationship with JH, [Petitioner] repeatedly expressed his desire for communication and a healthy relationship with JH's family."[30], (2) "[Petitioner] showed [Jurgensmeier] the letter he sent to KH prior to sending it. Based on [Jurgensmeier and Petitioner's] communication, it was clear[ ] that [Petitioner's] intention in sending the letter was a genuine effort to develop a healthy relationship with KH and the rest of JH's family."[31], and (3) "[Petitioner] talked with [Jurgensmeier] prior to calling KH in January 2006. It was evident that [Petitioner's] intention in calling her was to follow up on the letter he had previously sent and to try to make peace. [Petitioner] also wanted to help JH's family pay for JH's medical expenses."[32].

As with Petitioner's bail hearing in Alaska, Counsel, without notice or expressed reason, failed to call Jurgensmeier to testify at Petitioner's sentence hearing as had previously been arranged. Exhibit "H" at 17. As a result, Counsel failed to provide "a more direct and explicit character[ ] within

---

[27] *Id* at 9.
[28] *Id* at 10.
[29] *Id* at 11.
[30] *Id* at 12.
[31] *Id* at 13.
[32] *Id* at 14.

[its] power" to this Honorable Court and subsequently failed to provide an effective rebuttal to the Government's aforementioned arguments.   The Court, then, accepted those arguments.   The Seventh Circuit held that "[a] district court cannot rely on inaccurate information in sentencing a defendant; a sentence based on inaccurate information must be set aside". *Polson* at 567.  Petitioner asserts that Counsel's failure to call Jurgensmeier resulted in the Court basing Petitioner's sentence on "inaccurate information" (e.g. misconstrued impressions of Petitioner and the motive behind his and JH's relationship, and of Petitioner's efforts in making contact with KH), thereby invalidating Petitioner's sentence and rendering Counsel's assistance ineffective.   Accordingly, Petitioner's sentence should be vacated, and Petitioner should be allowed a resentencing with Jurgensmeier's essential and insightful testimony.

## 6. COUNSEL FAILED TO ASK THIS HONORABLE COURT TO RECOMMEND THE BOP'S RDAP PROGRAM FOR PETITIONER

Months prior to sentencing, Petitioner told Counsel of his drug abuse.  Exhibit "A" at 16.  Such abuse was noted in the probation officer's interview notes from Petitioner's initial bail hearing in Denver.   Later, the topic was discussed again in more detail during Petitioner's interview with the probation officer in Alaska (who composed Petitioner's PSR).   Paragraph 87 of Petitioner's PSR specifically mentions both Petitioner's drug abuse as well as the fact Petitioner was interested in participating in the BOP's RDAP program[33].

Petitioner, several times prior to sentencing, asked Counsel to initiate this subject at Petitioner's sentence hearing and to ask the Court to recommend the RDAP program for Petitioner, as one of the criteria considered when determining an inmate's eligibility for RDAP is whether the

---

[33] "[E]very prisoner with a substance abuse problem [shall] have the opportunity to participate in appropriate substance abuse treatment[.]"  18 U.S.C. § 3621(e).

judge recommend the program[34].     Exhibit "A" at 17.     Counsel failed to do so; thus, no recommendation was made.

As an incentive for nonviolent federal inmates who have drug abuse in their histories to participate in the RDAP program, Congress created a law offering a reduction of up to one year off the term of a nonviolent inmate's sentence upon successful completion of the program[35].     As the immediate offense is nonviolent, Petitioner would be eligible to receive a year off his sentence upon completion of the RDAP program.

It is axiomatic that a defense counsel has the duty to act as an advocate for his client within the ethical codes of his profession.     In the present case, Petitioner repeatedly asked Counsel to address this issue at sentencing, knowing that the Court's recommendation would help Petitioner be accepted into the program.     Effectively, Petitioner was asking for help with his substance abuse problem.     Despite Petitioner's concern, Counsel failed to address this issue during sentencing.     As a result, Petitioner may be prejudiced against when trying to qualify for RDAP and, by proxy of a resulting determination that Petitioner is deemed "ineligible", Petitioner will be denied the substance abuse treatment he seeks and also will not be eligible for the sentence reduction of up to one year. Thus, Petitioner asserts Counsel was ineffective.     Accordingly, Petitioner's sentence should be vacated, and Petitioner should be allowed a resentencing with the Court's consideration of this issue.

## 7. COUNSEL DEPRIVED PETITIONER OF HIS RIGHT TO A DIRECT APPEAL

Petitioner states, "Directly after sentencing, I briefly met with Counsel in the court building. My first words to Counsel were, 'I want to appeal.'  I explained that I was extremely upset with the sentence I had received and I felt had Counsel called JH to testify, as I had repeatedly demanded, I would not have received the enhancement for undue influence.  Counsel even told me not calling JH

---

[34] See BOP Program Statement (PS) 5330.10 § Attachment A, p. 2, item (3).
[35] See 18 U.S.C. § 3621(e)(2)(B).

to testify was 'probably an appealable issue'.  Counsel then explained that I would receive a higher sentence upon reconsideration of issues that had already been considered if I appealed, and subsequently, Counsel thought appealing was a 'bad idea'.  At that point, the meeting was abruptly interrupted by a U.S. Marshal opening the door to (my part of) the meeting room and announcing to me, 'It's time to go.'.  I explained that I was still talking with Counsel.  Unaffected, the U.S. Marshal repeated, 'It's time to go.', and took me, effectively ending the meeting.".  Exhibit "A" at 18.

Petitioner, of his follow-up efforts, states, "A day or two after sentencing, I called Counsel from Cook Inlet Pretrial and requested an in-person meeting to discuss my appeal.  Counsel explained that she was 'very busy' and '[didn't] have time to talk', and that she was 'not sure when [she would] be able to come in'.  No such meeting took place as I was flown back to SeaTac FDC on the morning of January 7, 2007.  From SeaTac FDC, I, still wanting to appeal, continued to make efforts to get a hold of Counsel by phone, but was unsuccessful.  Despite my efforts, I was not afforded an opportunity to discuss my appeal with Counsel, nor did Counsel file a direct appeal as I'd demanded (before my 10-day time limit to file a notice of appeal expired).  After my time limit expired, not knowing anything about my legal rights, I figured my chance to appeal was gone, so I did not push the issue from that point on.".  Exhibit "A" at 19.

Petitioner's parents, who were in Anchorage for Petitioner's sentencing hearing, state, "When I met with [Petitioner] at the Cook Inlet Pretrial facility the night of January 3, 2007 (he was sentenced earlier that same day), he indicated to me he told his counsel to file an appeal.  [Petitioner] was adamant about appealing.".  Exhibit "I" at 5, and Exhibit "J" at 4.  Jurgensmeier also states, "A day after [Petitioner] was sentenced, he called me and let me know he was going to appeal his sentence.".  Exhibit "H" at 19.

Counsel's performance must be considered deficient for not providing Petitioner an opportunity to discuss his appeal after Petitioner expressed that he wanted to appeal and made repeated efforts

to have said discussion with Counsel before Petitioner's 10-day time limit to file a notice of appeal expired. In *Roe v Flores-Ortega*, 145 L.Ed.2d 985, 1000 (2000), the Supreme Court ruled:

> "[W]e hold that when counsel's deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant had made out a successful ineffective assistance of counsel claim entitling him to an appeal."

Or, as stated by the Ninth Circuit:

> "The framework imposed by the Court for determining whether there was ineffective assistance of counsel was (1) ask whether counsel consulted with the defendant about an appeal; (2) if not, was failure to consult."

*U.S. v Sandoval-Lopez*, 409 F.3d 1193, 1195-96 (2005) (footnote removed).

Counsel's most obvious error, however, was failing to file notice of appeal, as requested by Petitioner.   Addressing this, the Supreme Court stated "[w]hen counsel fails to file a requested appeal, a defendant is entitled to [a new] appeal without showing that his appeal would likely have had merit". *Flores-Ortega* at 477.  Finally, the *Flores-Ortega* Court expressed:

> "Because '[t]hose whose right to appeal has been frustrated should be treated exactly like any other appellan[t],' we rejected any requirement that the would-be appellant 'specify the points he would raise were his right to appeal reinstated.'"

*Id* at 1000 (citations removed)(brackets in original).   Accordingly, per *Flores-Ortega*, Petitioner's sentence should be vacated and Petitioner should be entitled to a new appeal "without showing that his appeal would likely have had merit".  See *Rodriguez v U.S.*, 23 L.Ed.2d 340 (1969).

## 8. COUNSEL FAILED TO FUNCTION IN THE ROLE OF AN ADVOCATE BY RELYING ON A DEFENSE STRATEGY UNSUPPORTED BY FACT OR CASE LAW

When discussing defense strategies with Petitioner prior to sentencing, Counsel repeatedly told Petitioner, "Love is not a defense.".  Exhibit "A" at 9.  Petitioner told his Counsel "it [has] to be a defense because it [is] *the truth*".  *Id.* (emphasis added).  And given the *Bitsilly* ruling regarding the undue influence enhancement, it was the simplest way to defeat said enhancement as well as

24

mitigate Petitioner's sentence.  Petitioner implored Counsel to simply tell the truth.  As in other instances, Counsel refused to do as requested by Petitioner.

A. What's wrong with this strategy?   At sentencing, Counsel attempted to portray JH as a promiscuous teenager who used the internet to seek out men with whom to have intimate encounters. In other words, "[Counsel] relied on a defense in mitigation that was factually unsupported".  *Visciotti v Woodford*, 288 F3d 1097 (9th Cir. 2002).   "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."  *Flores-Ortega* at 997.    Though Counsel showed the Court a recent picture of JH wearing makeup[36] and transcripts of two isolated chat conversations of JH's involving the topic of sex, Counsel was unable to show that JH initiated the subject of sex in either conversation[37]; nor was Counsel able to show that JH had any intention to meet either of the people with whom she had said conversations, not to mention pursue sexual relationships with them. To the contrary, in fact, in her initial interview with the FBI, JH reported that Petitioner remains the only person with whom she has had sex.  Exhibit "B" at ¶ 3.  Further, a counselor who had been working with JH for approximately six months at the time of making the statement reported "[JH] appears to feel tremendous allegiance and commitment to [Petitioner]".  Exhibit "G" at ¶ 3. Additionally, Counsel provided no case law to support her strategy.

Beyond the fact Counsel's argument was not supported by fact or case law, Counsel's strategy was fundamentally flawed in that it focused on JH's behavior rather than Petitioner's behavior.  After all, it was Petitioner that was being sentenced, not JH.  Counsel's choices must be considered to be not only misdirected and disparaging to JH's character (which was entirely against Petitioner's wishes[38], and cast an indecorous light on Petitioner's position), but also unreasonable.

---

[36] The picture was found on JH's MySpace webpage.
[37]  A cursory review of said chat conversations will readily make clear that JH did not initiate the topic of sex in either conversation.
[38] Exhibit "A" at 17.

B. The Simple Truth. Counsel failed to show the Court that Petitioner and JH's relationship was consensual and "motivated by love, not abusive behavior"[39], as proven not only by Petitioner's words to JH, but by JH's and JS's statements to the FBI as well as the letters JH and JS wrote to Petitioner while he was in Alaska in 2004.[40] Counsel failed to interview JH and have JH testify without "[making] reasonable investigations or [making] a reasonable decision that makes particular decisions unnecessary"[41] when it was clear JH's testimony "may have been useful to the defense"[42]. Counsel failed to allow Petitioner to exercise his constitutional right to confront and cross examine a witness against him, to provide the Court a "clearing up of truth"[43]. Counsel failed to object to factual inaccuracies in Petitioner's PSR and failed to argue said inaccuracies at sentencing, thus effectively entering said factual inaccuracies into the record as "accepted facts" to be considered against Petitioner.[44] Counsel failed to call Jurgensmeier, who could have testified about Petitioner's genuine love for JH and Petitioner's good-hearted intentions in making efforts to communicate with KH.[45] These failures cannot be considered to be a result of reasonable decisions, and certainly cannot be considered to be strategic. The Supreme Court held:

> "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."

U.S. v Cronic, 80 L.Ed.2d 657, 668 (1984). Without providing such "meaningful adversarial testing", Counsel failed to "function in the active role of advocate". Entsminger v Iowa, 18 L.Ed.2d 501 (1967).

Petitioner's Sixth Amendment right to the effective assistance of counsel was denied as Counsel made "strategic choices after less than complete investigations"[46] while in possession of

---

[39] Bitsilly at 1193.
[40] See argument II(a)(1) in this Memorandum.
[41] Strickland at 691.
[42] Riley at 1320. Id. at II(a)(2).
[43] F.3 Blackstone, Commentaries at 373. See argument II(a)(3) in this memorandum.
[44] Id. at II(a)(4).
[45] Id. at II(a)(5).
[46] Strickland at 690.

evidence that clearly pointed to a much simpler and honest defense strategy supported by both *facts* and *case law*.  In the event these errors are not considered sufficiently prejudicial individually, their cumulative effect must be considered so prejudicial as to undermine confidence in the outcome of the proceeding, thus rendering ineffective assistance of counsel.  See *U.S. v De Cruz*, 82 F.3d 856, 868 (9th Cir. 1996); *Parle v Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004).   Accordingly, Petitioner's sentence should be vacated and Petitioner should be allowed a resentencing with the effective assistance of Counsel

**b. The Government willfully suppressed information favorable to and requested by Petitioner.**

At Petitioner's preliminary bail hearing in Denver, the Government disclosed to Petitioner's (initial) appointed counsel statements made by JH to the FBI. Petitioner's initial counsel forwarded these statements on to Counsel (who represented Petitioner in all subsequent court appearances). Subsequent to Petitioner changing his plea, Counsel revealed to Petitioner that the Government had informed Counsel that JH had been interviewed by the FBI more than once[47]. Counsel requested transcriptions of the subsequent interview(s) of JH. *Id*. The Government failed to reply to said request and failed to provide said requested transcriptions.

In the landmark *Brady v Maryland*, 10 L.Ed.2d 215 (1963), the Supreme Court held:

> "The suppression by the prosecution of evidence favorable to and requested by an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

It was later established that to make a successful *Brady* claim a petitioner must prove (1) the suppressed evidence would have been favorable to the petitioner, (2) the evidence was suppressed willfully, and (3) the suppression resulted in prejudice. See *Strickler v Greene*, 144 L.Ed.2d 286 (1999).

### 1. THE SUPPRESSED EVIDENCE WOULD HAVE BEEN FAVORABLE TO THE PETITIONER

Given that the Government not only did not call JH – the material witness – to testify, but also did not present a single statement of JH's from any of the interviews the FBI conducted with her, in light of *Leecan* and *Culbertson*, it is fair to assume that JH would not have been a favorable witness

---

[47] Exhibit "A" at 10.

to the Government; given that "red flag", it can reasonably be extrapolated that her statements "may have been useful to the defense".[48] *Riley* at 1320.

### 2. THE EVIDENCE WAS SUPPRESSED WILLFULLY

The Government announced to Counsel that JH had been interviewed more than once by the FBI. Exhibit "A" at 10. Counsel explicitly requested transcriptions of said interviews. *Id.* The Government did not reply to said request; nor did the Government provide the requested transcriptions. The Government's failure to respond to and comply with said request must be interpreted as "willful suppression".

### 3. THE SUPPRESSION RESULTED IN PREJUDICE

In *Kyles v Whitley*, 131 L.Ed.2d 490, 506 (1995), the Supreme Court stated

> "a 'reasonable probability' of a different result is accordingly shown when the Government's suppression 'undermines confidence in the outcome of the trial'."

(citation removed). In light of the statements of JH's already in Petitioner's possession coupled with the criteria for establishing "undue influence" set forth in *Bitsilly*, it is "reasonably probab[le]" that JH's statements that the Government suppressed would be similar to her initial statements which were already in Petitioner's possession and resultingly "undermin[e] confidence" of Petitioner's sentence.[49] As a result, Petitioner's due process was violated when the Government willfully suppressed statements favorable to and requested by Petitioner, and Petitioner's sentence was prejudiced with the two-level enhancement for undue influence. Petitioner's sentence should be vacated; Petitioner should be entitled to full disclosure of all statements made by JH to the FBI; and Petitioner should be allowed a resentencing accordingly.

---

[48] See Argument II(a)(2)(B) of this Memorandum.
[49] See Argument II(a)(2) of this Memorandum.

## III. CONCLUSION

"While a criminal [proceeding] is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *U.S. ex rel. Williams v Twomey*, 510 F.2d 634 (7th Cir. 1975). Certainly one of the more colorful quotes Petitioner came across while doing research for this Memorandum, it elicits an image that Petitioner feels summarizes his sentence hearing. The Government was clearly more prepared than Counsel; and the Government's courtroom "fencing" skills were sharper and more refined than those of Counsel. Without the support of a reasonable defense strategy or sharp courtroom whit, Counsel offered Petitioner to the Government as a sacrificial lamb.

It is disturbing how deftly and purposefully the Government obscured the *bigger* truth from this Honorable Court when the Supreme Court, long ago, held "The United States Attorney['s] interest[ ] in a criminal prosecution is not that it shall win a case, but that justice shall be done.". *Berger v U.S.*, 79 L.Ed 1314 (1935). Given that, purposely obscuring significant information from the Court, while perhaps efficient conviction and penal-phase strategies, must ultimately be considered flawed as, in the end, they interfer with the execution of *justice*. What is more disturbing yet is the fact Counsel furthered said obscuration by not presenting the plethora of JH's statements – including the statements JH (and JS) made to the FBI[50] – which clearly show that Petitioner and JH's relationship was "motivated by love, not abusive behavior"[51], and that Petitioner and JH's choice to be intimate with each other was a *joint decision*. Rather, Counsel employed a defense strategy orphaned from fact or case law. Had those statements been presented, it is inconceivable that this Honorable Court would have applied the undue influence enhancement to Petitioner's sentence.

---

[50] Exhibit "B" and Exhibit "C", respectively.
[51] *Bitsilly* at 1193.

Equally as curious is Counsel's decision to ignore the "red flag" that JH, the material witness, "may have been useful to the defense"[52] and failed to interview JH as part of Counsel's "duty to make reasonable investigations"[53]. To borrow the succinct words of Circuit Justice Gould, "[Counsel] unmistakably did not conduct a reasonable investigation that rendered [the material witness]'s testimony, much less and interview, unnecessary". *Riley* at 1319. In the event JH's prior statements coupled with JH and JS's affirmations that Petitioner and JH's relationship was consensual did not persuade the Court that JH's decision to be intimate with Petitioner was made free of "undue influence" and was a *joint decision*, JH's direct testimony would have been necessary to "clear up the truth"[54].

Beyond that, Petitioner's sentencing was plagued with factual inaccuracies and procedural errors which amassed like malignant tumors. Though they lacked *indicia* of reliability, KH's statements against Petitioner were considered. Meanwhile, statements from Jurgensmeier, by all standards an upstanding individual, who could have testified about Petitioner's genuine love for JH and Petitioner's good-hearted intentions in making contact with KH, were not even presented. Impairing Petitioner further, the Government ignored Petitioner's request for, and knowingly withheld, statements made by JH to the FBI, which, in light of JH's previous statements coupled with the fact the Government never presented a single one of those statements to the Court, would likely have been favorable to the defense. And despite Petitioner's requests, Counsel did not ask this Honorable Court to recommend the BOP's RDAP program for Petitioner, which would not only provide Petitioner the rehabilitative education he seeks, but, by proxy of successful completion of said program, reduce Petitioner's sentence by one year. The collateral sum of the foregoing shortcomings must be considered handicapping to Petitioner's ability to fairly defend himself, and thus, and prejudicial.

---

[52] *Riley* at 1320.
[53] *Strickland* at 691.
[54] F.3 *Blackstone*, Commentaries at 373.

Finally, directly after sentencing, Petitioner, startled by the sentence he received, sought the legal relief to which this Honorable Court notified him he was entitled, and told Counsel, "I want to appeal.".   Exhibit "A" at 21.  Counsel, however, allowed Petitioner's 10-day time limit to direct appeal expire without affording Petitioner the opportunity to discuss appealing as requested by Petitioner and also ignored Petitioner's specific instruction to file notice of appeal, thus depriving Petitioner his legal right to direct appeal.

In closing, the Government, and curiously, Counsel, did everything in their collective power to obscure the bigger truth from this Honorable Court.  The fact-of-the-matter is the voices of the people who actually know the truth about the present case were effectively silenced, concealing the simple truths that JH was not unduly influenced, and though illegal, Petitioner and JH's relationship was loving and consensual.  To reiterate the eloquent words of Chief Justice Vazquez in *Bitsilly*:

> "These extraordinary facts separate Defendant's case from so many of the other sexual abuse cases that the Court regularly sees[.]  The instant case presents a much different picture.  [Minor] and Defendant clearly are in love and miss one another[.]  I do not believe that the Sentencing Commission contemplated such a situation when formulating the relevant Guideline provision."

*Id.* at 1196 and 1198.  Petitioner implores this Honorable Court for the opportunity to allow Petitioner to properly defend himself by presenting the *whole* truth.

**WHEREFORE**, Petitioner respectfully requests that this Honorable Court reinstate Petitioner's direct appeal rights per *Flores-Ortega*. Petitioner further requests that this Court hold an abeyance his other claims until the resolution of said ineffective assistance of counsel claim (**GROUND SEVEN**, see argument II(a)(7) of this Memorandum) because the broader constitutional question in this case must be answered first on whether or not Counsel defied Petitioner's specific request to file his direct appeal. If it is determined the remaining grounds need to be addressed, Petitioner respectfully requests that this Memorandum be held in abeyance as Petitioner just received his sentencing transcript on December 11, 2007 and documentation compelled from Counsel (see Docket 63, ORDERED in Docket 64), which may be needed to appropriately amend this Memorandum per F.R.Cr.P. 15(c). Further, Petitioner was a victim in a major riot at FCI Big Spring, which has since been "locked down". Petitioner has been moved into protective custody, where he has no access to his property (including the application for his 2255, financial affidavit, and request for appointment of counsel), legal research material, PSR (through his counselor), a typewriter, or telephone; staff has indicated Petitioner is to remain in protective custody until his injuries heal. Petitioner will provide this Honorable Court a written update on his health and circumstances and on the receipt of said items within 60 days. Accordingly, Petitioner respectfully requests written consent from this Honorable Court confirming that GROUNDS 1-6 and 8-9 will be held in abeyance until the determined necessity of their consideration with an allotted extension of 60 days for a final submission of remaining grounds and supporting documentation, given the unforeseeable difficult circumstances. In the alternative, Petitioner respectfully requests any other relief this Honorable Court deems appropriate in the liberal construction and the protection of his constitutional rights as a *pro se* and indigent prisoner.

Dated: December 15, 2007


Respectfully submitted,

_____

**BROCK PURVIANCE**
*In propria persona*


Typed by Frederick G. Muñoz.

34