3

1        ANCHORAGE, ALASKA – WEDNESDAY, JANUARY 3, 2007

2

3        (Call to Order of the Court at 8:36 a.m.)

4        (Defendant present)

5            THE CLERK:  All rise.  His Honor the Court, the United

6    States District Court for the District of Alaska is now in

7    session, the Honorable John W. Sedwick presiding.  Please be

8    seated.

9            THE COURT:  Good morning.

10            MS. RENSCHEN:  Morning.

11            MS. TATTER:  Good morning, Judge.

12            THE COURT:  We're gathered here this morning for

13    proceedings in an Anchorage criminal case.  It's number 3-06-

14    cr-40, *United States versus Brock John Purviance*.  Are the

15    parties prepared to proceed?

16            MS. RENSCHEN:  Yes.

17            MS. TATTER:  Yes, Judge, assuming that there are no

18    witnesses to be called.

19            THE COURT:  My understanding is that the government is

20    planning to call witnesses to testify.

21            MS. RENSCHEN:  Your Honor, having reviewed the matter

22    after receiving Ms. Tatter's sentencing memorandum, I no longer

23    think it's necessary to present the witnesses --

24            THE COURT:  Very well.  Well, that's --

25            MS. RENSCHEN:  -- earlier --

*A & T TRANSCRIPTS*
*(817) 685-7556*

4

1          THE COURT:  -- your decision.

2          MS. RENSCHEN:  However, I will be presenting some

3    rebuttal to Ms. Tatter's presentation as to the undue

4    influence.  It's my understanding that she's going to be

5    presenting some additional argument and testimony on that.

6          THE COURT:  Well, let me make sure I understand.

7    You're both going to have ample opportunity to argue.  Are

8    either of you planning to present testimony?

9          MS. TATTER:  No.  My parent -- my client's parents

10   would like to address the Court, as I assume the prosecution's

11   parents would like to also.  But that's not testimony.  That's

12   simply --

13         THE COURT:  All right, well --

14         MS. TATTER:  -- addressing --

15         THE COURT:  -- I'll certainly hear from them.  But you

16   don't have any witnesses, ma'am?

17         MS. TATTER:  No, I don't.

18         THE COURT:  And you don't have any witnesses?

19         MS. RENSCHEN:  I don't, Your Honor.  I do have some

20   materials, some of the on-line conversations between the

21   defendant and the victim that I would like the Court to be

22   aware of.

23         THE COURT:  All right.  All right, well, then it would

24   appear that we're -- we should be prepared to proceed at this

25   point.  We're here this morning because Mr. Purviance pled

*A & T  TRANSCRIPTS*
*(817) 685-7556*

1  guilty pursuant to a plea agreement to one count of interstate

2  travel to engage in illegal sexual contact, in violation of 18

3  United States Code Section 2432. That is a class B felony.

4         A presentence report has been prepared. The only

5  information withheld from the presentence report consists of a

6  supplemental coversheet with two attachments. The first

7  attachment is a victim impact statement, dated November 14,

8  2006, from Kimberly H., who is the mother of the child involved

9  in the defendant's crime. The second attachment is a letter

10  from a licensed clinical social worker named Christy Lee

11  Williams, reporting her observations of the child victim based

12  upon a course of outpatient counseling which began on August

13  24th, 2005.

14         In order for the Court to make use of these materials

15  at sentencing, Federal Rule of Civil -- Criminal Procedure

16  32(i)(1)(B) requires that a summary of the materials be given

17  to the defendant as well as to counsel for the government.

18  However, these materials were provided to the Court on the

19  condition that they would not be disclosed to the defendant.

20  That makes it impossible for me to make use of the materials

21  themselves. It may be noted, however, that much of what is in

22  them overlaps the information in the presentence report and in

23  the parties' own sentencing papers and exhibits. So while I

24  cannot rely on the two attachments and will not do so, I am

25  able to rely on some of the same information because it is

6

1  available from other sources to which the parties do have
2  access.

3         Mr. Purviance, have you read the presentence report?

4         THE DEFENDANT:  Yes, I have, Your Honor.

5         THE COURT:  You can move that microphone a little
6  closer if you like.

7         THE DEFENDANT:  Okay.

8         THE COURT:  And have you discussed it with your lawyer?

9         THE DEFENDANT:  I'm sorry, what?

10        THE COURT:  Have you discussed the presentence report
11 with your lawyer?

12        THE DEFENDANT:  Yes, I have.

13        THE COURT:  I've read the presentence report in the
14 parties' sentencing materials.  Based upon the information
15 available, I accept the plea agreement at this time.

16        When determining the sentence to be imposed, I will
17 consider the factors specified in 18 United States Code Section
18 3553(a), which requires me to make findings of fact for use in
19 application of that statute as well as for application of the
20 advisory guidelines published by the United States Sentencing
21 Commission.

22        The United States made no objections to the presentence
23 report.  Defendant made a number of objections.  Two of them
24 are easily resolved.  The others will require further argument
25 from the parties before they can be resolved.

1     The first objection we can resolve now is the
2  description in paragraph 33 of photographs depicting the
3  defendant, the victim, another minor female, or some
4  combination of those people.  The probation officer's
5  adequately explained why the description is in his addendum, so
6  that objection is overruled.
7     The next readily resolved objection is to paragraph 53,
8  which is that the minor females mentioned there were not
9  actually minors when they were interviewed.  I agree that the
10 paragraph is awkwardly written, but when read in context with
11 the following paragraphs, I think it is clear enough that C.A.
12 and T.W. were minors when they had initial contact with Mr.
13 Purviance but were no longer minors when they were interviewed.
14 So this objection's also overruled.
15     Defendant has made more substantive objections and ones
16 which are of greater consequence.  The first of these is to
17 paragraph 42, which states that defendant unduly influenced the
18 victim and so is subject to a two-level upward enhancement
19 under Guideline Section 2A3.2(b)(2)(B).  Defendant also objects
20 to the statements reported in paragraphs 54 through 69, which
21 would provide a basis for concluding that defendant has a
22 history of inappropriate behavior with minor females.
23     Before we consider those objections, let me say that I
24 find all of the other statements of fact in the presentence
25 report to be supported by a preponderance of reasonably

1  reliable evidence, adopt them, and make -- in my findings of

2  fact for this proceeding.  In addition, based on the numerous

3  letters from defendant's friends, I also find these facts:

4  Defendant is an accomplished musician with a stable work

5  history.  Defendant's friends saw no evidence of inappropriate

6  behavior by him with minors.  Defendant was highly regarded by

7  his friends, who all professed to be surprised by the crime he

8  committed.

9       All right, at this time I'd like to get the objection

10 to paragraph 42 resolved.  So, Ms. Tatter, I'll hear from you

11 and then I'll hear from Ms. Renschen.  And at this time I'm

12 asking only for argument respecting paragraph 42.

13      MS. TATTER:  Judge, undue influence is a special

14 enhancement to -- that raises the level of having sex with a

15 minor.  The base level is a serious crime, crossing state lines

16 to engage in illegal sex with a minor.  So there must be

17 something to take it beyond most cases.  And I think it's

18 analogous to the enhancement for being a teacher or a custodian

19 of a minor, which is a four-level enhancement, and then there's

20 a two-level enhancement for undue influence presumed when the

21 person's more than 10 years older, but rebuttable.

22      So not every incident of sex with a minor is going to

23 be subject to undue influence, although many, many cases where

24 this a -- an age disparity, there could be undue influence.

25 And there is no law that the prosecutor or I have been able to

9

1  locate at this guideline, undue influence.  But I think the

2  language of the guideline makes it fact-specific to this case.

3  The Court has to look at the parties at the time the illegal

4  sex took place and say, was this person pushed into doing

5  something she didn't want to do; was compulsion --

6  psychological compulsion brought to bear.

7          And I think you look at two things.  You look at -- I

8  considered subpoenaing the minor, but I think that was a bad

9  idea, because the relevant time period is 2004, August, when

10 the time of the illegal act occurred.  In the chats, in the e-

11 mails which we've been provided, not only by the government but

12 by the key logger which the father installed on the girl's

13 computer, it -- it's apparent to us and I hope to the Court

14 that this was a person who was interested in this kind of

15 activity.  She wasn't hesitant.  Her will wasn't overborne.

16         I think you look at her and you look at what language

17 the defendant used, both.  We gave the Court some chats in

18 which she was in a chat room, involved in virtual sex with

19 somebody named Todd.  But there are others.  There's Brian and

20 Mike -- I have two packages of conversations with them.  At the

21 same time as Brock Purviance is talking to her about music,

22 other people are talking to her about very explicit sexual

23 material, giving her directions, and she's accepting them.

24         Now, that's not to say that my client didn't encourage

25 sexual activity.  But no -- not overbearing will.  There's a

10

1   lot of this activity that would be admissible at a trial or in

2   a -- in any consideration of a minor having sex, but for the

3   enhancement. The enhancement means that there was something

4   overbearing, pressured, in this case.

5           For example, if the person were shy and disabled and

6   obese and subject to all kinds of problems and lived at home

7   and had mental problems, and was just so eager to have

8   connections, that might be a situation where there was

9   overbearing behavior. Or if there was great pressure. But I

10   think you need to look at the fact that this was a minor who

11   was willing to engage in this activity and in fact who was

12   chafing at restrictions and on the Internet all the time, hours

13   and hours and hours in these chat rooms where people were

14   engaging in much more explicit activity than we have evidence

15   of Mr. Purviance at that time.

16           Other evidence of lack of undue influence is in the

17   nature of the meeting itself. My client did engage in the e-

18   mail that the prosecutor quoted, saying, "Why don't you throw a

19   tantrum? Why don't you just tell your parents that you deserve

20   to get out of the house once in a while?" Notably, this minor

21   didn't take that suggestion. She arranged another plan that

22   was covert, that was clever and under the radar. She didn't

23   have a confrontation. She arranged to stay with her friend.

24   She had to do the groundwork, even though it was to my client's

25   advantage and he approved of it. She clearly had the autonomy

1    to figure this out.

2          So I don't think in the nature of this particular case

3    there is undue influence the way the guideline intends.  I

4    think there has to be some kind of either compulsive behavior,

5    pushing, overbearing, or some real resistance on the part of

6    the young woman.

7          So we have prior sexual activity on the Internet, no

8    compulsion in the fact situation in this case.  We have the

9    minor's own descriptions in the e-mails that the Court has seen

10   and many, many that the prosecution I'm sure will not dispute.

11   She's articulate, she's intelligent, she's not somebody who's

12   easily pushed around.  She chafes at restrictions of her school

13   or her family, she criticizes things.  She's really a free-

14   thinker.  She wasn't like part of the ordinary high school teen

15   spirit.  She was interested in music, she's interested in

16   videos and films, and you can see from her expression that she

17   must have a high IQ and she must be a very deep thinker for her

18   age.

19          So it's not somebody who got -- was easily pushed

20   around and who got overborne.  Her current expression is that

21   she's still on the Internet in a My Space situation, Exhibit H,

22   meeting people.  She's not afraid of life.  She -- her handle

23   is SOS, So Overly Sexy.  And her photograph is there.  And it's

24   not -- she's not a fearful, hesitant person.

25          In this set of facts, where, as you can see, and I'm

1  sure the prosecution won't dispute, there are -- these are nice

2  pictures, they're pretty.  The people aren't salaciously

3  embracing.  They're in a -- woods with the friend J.S., and the

4  sunset is coming down, and they're nice to each other and

5  they're compassionate.  And it isn't a devious, angry,

6  compulsive manipulation of an unwilling person.

7        I think the record that we've presented -- and I have

8  extra chats of other incidents of virtual sex which I would

9  like to supplement the record with.  They're from the key

10 logger that the government provided.

11       MS. RENSCHEN:  What do you want me to do with them?

12       MS. TATTER:  I would just like to submit them to the

13 Court if --

14       THE COURT:  You may do that.

15    (Side conversation)

16       THE COURT:  Thank you.

17       MS. TATTER:  One is conversations with someone named

18 Mike and one is conversations with someone named Brian.  And I

19 submitted conversations with someone named Todd.

20       THE COURT:  Well, let me ask you this.  When did these

21 conversations you've just given me take place?

22       MS. TATTER:  Pardon?

23       THE COURT:  What date did they -- there -- there's a --

24 there's an --

25       MS. TATTER:  This is --

1          THE COURT:   -- hour but there's no date.

2          MS. TATTER:   The top of it is in 2004.

3          THE COURT:   All right.   Where it says the file, is that

4     the date, 06/27/04?

5          MS. TATTER:   It's in -- yes.

6          THE COURT:   So that would be -- all right, June 27th,

7     2004.   Looks like -- are they all that same date?

8          MS. TATTER:   I don't think so.   I think they're

9     chronological.

10         MS. RENSCHEN:   Actually, they are --

11         MS. TATTER:   (Indiscernible) the numbers --

12         MS. RENSCHEN:   They are all on that date.

13         THE COURT:   So far that's all I'm seeing.

14         MS. TATTER:   Okay.

15         THE COURT:   So there was a lot of chatting going on at

16    that time.   And am I understanding this correctly, that it's

17    the conversation with Brian and a conversation with Mike?   I

18    mean, it's in and out, or --

19         MS. TATTER:   In and out, yeah.

20         THE COURT:   -- all three of them talking?

21         MS. TATTER:   All three of them are talking.   And --

22         THE COURT:   Oh.

23         MS. TATTER:   Except they're two separate.   I think what

24    happened is she went offline with Brian and she went offline

25    with Mike, and then back into the chat room at various times.

1          THE COURT:  All right.

2          MS. TATTER:  And the point of this is that the minor

3   was interested and active.  It's not determinative any more

4   than a particular statement of my client is determinative.  He

5   certainly was trying to be flirtatious in urging her, but in

6   view of the fact that this is an enhancement, all the

7   circumstances here suggest that this was mutual activity, even

8   though there was a age disparity, that the relationship itself

9   was not coercive during the relationship.

10          THE COURT:  All right, thank you, Ms. Tatter.  I'll

11  hear from Ms. Renschen.

12          MS. RENSCHEN:  Your Honor, may I approach?  I have some

13  materials for the Court as well.

14          THE COURT:  You may.  I gather --

15          MS. RENSCHEN:  And I --

16          THE COURT:  -- Ms. Tatter's been --

17          MS. RENSCHEN:  I've provided --

18          THE COURT:  -- given copies?  Yeah.

19          MS. RENSCHEN:  -- copies of --

20          MS. TATTER:  Yes.

21          MS. RENSCHEN:  -- everything (indiscernible).

22          THE COURT:  Thank you.

23          MS. RENSCHEN:  Your Honor, I'd ask the Court to keep in

24  mind something that I think is basic for the kind of offense

25  that the Court is presented with here.  And that is that all of

1    us are shaped by our experiences.  And when those experiences

2    happen, they have a great deal to do with our later life.  I

3    think that's one of the main reasons that we do our best as a

4    society to protect our children from things that are adult and

5    for which they are not equipped either emotionally or

6    intellectually or experientially.

7            I think in this particular case it's important to keep

8    in mind the time frame over which Mr. Purviance was conversing

9    with this child.  One of the materials that I handed you, which

10   is after the first clipped material, is an e-mail from Mr.

11   Purviance in which he says to the child -- he makes a reference

12   to another e-mail that he had forwarded to her, and he admits,

13   "That means we were talking before September 13th, even though

14   there was a break in there.  I bet anything it's been more than

15   a year now."  And that e-mail is dated August 3rd of 2004,

16   which means a year prior would have been August 3rd of 2003,

17   when the child would have been 13 years old.

18           I think that's significant.  I think it's important to

19   note that the arguments that Ms. Tatter has made are based on

20   where the child is now, where the child was on the date when

21   the defendant traveled to have sex with her, and I don't think

22   that where she was on those dates is the same place as where

23   she was when she began speaking with the defendant.

24           As an example, I'd refer the Court to the e-mail dated

25   May 10th of 2004.  That is a response by the child to questions

1    that Mr. Purviance sent to her.  And that series of questions

2    indicate -- and I'm going to go through and read the questions

3    so that the Court knows how Mr. Purviance actually formulated

4    his conversations and hooked her into the conversations.

5            Number 1:  "When it first came up, you said you wanted

6    to wait until you were married until you had sex.  Now you've

7    said you want to be with me now.  And we're not married, are

8    we?  Why did you change your mind?  Are you sure?  If so, what

9    makes you sure?"  That's the first indication that there's been

10   a movement on her part that even he recognizes from the

11   conversations.

12           Number 2:  "Does it bother you or strike you as being

13   wrong in any sort of way when we talk about sex?  Why or why

14   not?"

15           Number 3:  "Does it bother you or strike you as being

16   wrong in any sort of way when I ask about your body?  Why or

17   why not?"

18           Number 4:  "You've said that the pics I sent to you

19   didn't strike you as being bad or good, but since, you've made

20   jabs at me for having them, which really are on disk that a

21   friend gave me, no joke.  I think you even wanted me to explain

22   it to you or something.  Do you really think it's okay?  Why or

23   why not?"  The child then goes on to refer to the pictures, and

24   it -- it's apparent that they're pictures -- nude pictures of

25   the defendant.

1          Number 5: "How do you feel about the more recent stuff

2   we've done on the phone?" And I think her answer is

3   particularly important: "I've actually liked it a lot, if

4   that's a good thing or not. It's weird. Basically everything

5   that we have done stood against all that I used to believe in.

6   But it doesn't feel wrong, it feels right. It makes me feel

7   really close to you and it turns me on a lot. You probably

8   could tell that, though."

9          He then asked her how she feels about "the idea of us

10  doing stuff on camera for each other." She talks about

11  nervousness. Finally, the last two questions: "Do you think

12  having me being way older and super-far away is going to have

13  any impact on your day-to-day happiness? If so, what? Do you

14  think us will take away your childhood? Explain." She

15  explains, "Well, in a sense yes, and in a sense no. In a sense

16  yes, because I don't know many children that lose their

17  virginity -- well, I do, but not normal children, ha-ha. In

18  the second sense, no, I don't. I will still have my childhood

19  whether I'm with you or not. It'll always be there. You can

20  be an adult and still be living in your childhood. It's just

21  how it is -- shrugs."

22         Later that month, the defendant sends an e-mail to her.

23  That one is dated May 30th. And in there he talks about his

24  feelings about her and he goes on to describe her and says,

25  "What is it about you? In short, you're a deeply beautiful

1  person.  You're one of the gifted people who was born with a
2  good sense of your place, where you are, how you fit in." He
3  goes on, he talks to her and in effect strokes her and tells
4  her how good she is and how beautiful she is and how interested
5  he is in her, which at the time, she's a 14-year-old child, and
6  a 14-year-old child that this defendant has already spent a lot
7  of time talking about sexual activity.  And it's clear even in
8  May that her position in life, her thoughts about life, what
9  she believed about life, has changed dramatically because of
10  the influence that he has had on her.

11        And that I think exemplifies that adjustment of undue
12  influence.  That's why there's a presumption when an adult is
13  10 years or more older than the child that there's undue
14  influence.  But it's not a situation of equals.  It's not a
15  situation of people who are on the same intellectual plane or
16  the same emotional plane or the same experiential plane.

17        And it's specifically important to recognize what Mr.
18  Purviance's prior experience has been and practice that he's
19  had in talking to 14-year-old girls online.  He did not dispute
20  in any of the objections that he contacted T.W. when she was 14
21  years old and talked to her online, and later became involved
22  in a sexual relationship with her when she was 17.  He did not
23  deny or object to the fact that he contacted a 14-year-old girl
24  in Colorado and that he went to her house and had sex with her.
25  Those are experiences that he's had as an adult, talking to

1  children.

2        This child in Alaska didn't have those experiences.

3  Before she started talking with the defendant, she had not

4  talked to people about sex on the Internet.  She had not

5  imagined having sex.  It was only after the conversations that

6  he had, after the questions that he asked her, after he drew

7  her out and engaged her.  At that point, she was very

8  malleable, as any child is on the Internet at that age.  And I

9  think it's important to recognize that what he said and did

10 with her made her willing ultimately to have sex with him.

11       The other matters that I've prepared for the Court is

12 an August 3rd, 2004 e-mail where the defendant pressures her,

13 does it very gently but nonetheless establishes pressure but

14 tells her, "It's going to be expensive for me to fly to Alaska;

15 I guess there isn't such thing as a cheap fare to Anchorage.  I

16 found some around $300.  I definitely want to speak with you

17 before I buy my ticket.  I'm not going to hold you responsible

18 for me having a good time while I'm there.  The only thing I'll

19 hold you accountable for is at least making sure we can meet

20 up.  Like you said, there's a chance we might feel differently

21 toward each other after we meet.  I'd be bummed if that

22 happened, but at the same time, I guess it's better to find out

23 now."

24       Then he goes on and talks to her and asks her about

25 what her ideas and concerns and fears are, and he again brings

1   up the money and says, "Well, I know $300 isn't much.  It'll

2   end up being to 500 to $600 after lodging, car, and food.  But

3   it's a lot to me right now.  At the same time, waiting is

4   driving me crazy, so it's -- I think it's something I should

5   do.  As I said, I won't hold you responsible for one penny of

6   it, no matter how things go.  At the same time, I also don't

7   want to make this commitment until I know you've thought this

8   through thoroughly and you're sure about it."  And then he goes

9   in to take a shower and he gets back to her and asks if she got

10  the e-mail, and she says, "Yeah, I'm still thinking."  And he

11  says, "Coolio, right on.  I'll be here for a bit.  I guess just

12  send your thoughts to me whenever you're ready."

13          She responds, "I don't know.  I'm not sure.  I would

14  love if we met up and stuff, but I guess I hate not being able

15  to guarantee that we can do that.  I mean, things happen and, I

16  don't know, I can see it working but I can also see it not

17  working too.  It's like this huge conflicting argument I'm

18  having with myself.  It would be loads better in about a year

19  or two, just because I think it'd be easier to get away with

20  it.  But at the same time, I have a feeling it's not going to

21  get easier.  As long as the plan's good enough -- shrugs -- if

22  we go through with it, there's the chance of getting caught,

23  and I guess right now in that sense of getting caught is an

24  issue, it's not that bad, because they've already done what

25  they can for the most part.  The only thing they can do is take

1    away the computer and restrict the phone. And it's not like I

2    use the phone much now. The computer thing would suck, but

3    there's ways to work around that. I guess I also feel guilty

4    you're coming up here. Me, I know I'm being vague and stuff,

5    but it's loads easier thinking stuff than it is to write down

6    what you think, because it gets all muddled and the words seem

7    to disappear -- laugh out loud."

8          The defendant goes on and continues to talk to her

9    about that, asks her of a plan. She says, "Oh, I suck at

10   plans." He says, "Oh, you can do it." And she says, "Well,

11   I'll think of something." And he says, "Is that a yes? Are

12   you going to keep thinking?" She says, "Yeah, that's a yes --

13   laugh out loud." And then he goes on and tells her that he

14   loves her.

15         After that, the next day, her father talks to her about

16   some of the things that he's seen that she's been doing on the

17   Internet, and she reports -- she, the child, reports to Mr.

18   Purviance that he's aware of things and he's been keeping tabs

19   on what she's writing and taking screen shots, that he noticed

20   that she had deleted 160 items from her e-mail. And Mr.

21   Purviance says to her, "Are you able to delete items so they're

22   not readable by him? Did he actually see that we were e-

23   mailing each other? I mean, like know that it was me?" And

24   says, "Yeah, your name was on it as responses and stuff. I

25   thought that what I was doing right now was making it able so

1  that he couldn't, but now I'm not so sure." And then they go

2  on and try to talk about how to get around her father and how

3  they're going to make sure that he doesn't learn anymore. And

4  he points out -- he says, "Odd, 163 items that were deleted,

5  the one he found was old, took from like a month ago or more.

6  There have been literally thousands since then." And

7  everything we found in the computer forensics backs that up,

8  that they had literally almost 5,000 different conversations

9  that were documented and preserved in his computer. That's

10  apart from anything that would have happened on a chat or an

11  Instant Message that would not have been preserved there.

12        The next day, August 5th, he again presses her and

13  says, "Any developments with the plan?" She says, "Oh, I've

14  got a few ideas, not sure if they're that good though." He

15  brings up, "Is your mom going to be out of town for a funeral?"

16  And she says, "Yeah, that was one of the ideas I had, the 20th

17  to the 23rd, she said." He says, "Oh, that's too soon, I

18  think." Then he says, "Maybe not. Ah, never mind. Those are

19  weekend days anyway. Plus, if your dad is home all the time

20  anyway, what difference does it make?" Then she says, "Laugh

21  out loud -- the other is some weird-ass plan I don't think

22  would work. It sounds like my dad might be out of town too.

23  Actually, it'll just be my brother at home -- shrugs -- but

24  there's bound to be people always coming over and stuff those

25  days. I thought maybe I'd convince my mom to let me stay at

1    Jessica's those days she's gone -- shrugs."  "I could totally

2    make that happen then," Mr. Purviance says.  "Do you think I

3    can crash in your parents' room?"  She says, "Probably wouldn't

4    be a good idea to come over to my house, but if you want people

5    wondering why you're over and get all suspicious and stuff,

6    sure thing."  And then says, "Are they certain that those are

7    the dates they're going to be gone?  Do they have their tickets

8    yet?  I could fly those same days."  She says, "I'm not sure,

9    I'll check up on it."

10          So I read those to the Court to make it clear that this

11   is not a situation where we have a child who may be more

12   intellectually -- who may be intellectually stronger than the

13   adult she's with.  This is a situation where the defendant has

14   molded her over a period of years.  It was -- he had been in

15   contact with her on the computer for over two years before her

16   family found out about the fact that they had had sex and

17   before they found out that he had made two trips to Alaska to

18   have sex.  Despite the efforts that her parents made to take

19   away her computer privileges, take away her phone privileges,

20   he always worked around that.  He sent her a cell phone.  He

21   did things to get behind the back of her parents.

22          And that is undue influence.  That is a -- an adult

23   manipulating a child.  That is not two people who are standing

24   on equal ground, but it's an adult who has had experience in

25   talking with 14-year-old kids online.  He's had very successful

1   experience talking to them and then later managing to have sex

2   with them.  And I think that the Court needs to take into

3   account where the defendant is coming from and where the child

4   is coming from in order to see, in order to weigh and determine

5   where there was undue influence.

6          Essentially, the defendant is trying to put the blame

7   on the child and say, "This child was just, you know, too

8   mature.  I couldn't resist."  The fact of the matter is, he

9   knew from the beginning that she was a child.  This wasn't a

10  situation where the child was being untruthful with him or

11  holding herself out as an adult and leading him on.  This was a

12  situation right up front where she said, "I'm 14," and in fact,

13  she was actually 13 at the point at which he contacted her

14  initially, by his own admissions.  Those are all important

15  factors for the Court to consider the undue influence.

16          THE COURT:  Thank you.  I'm going to have these --

17          MS. TATTER:  Judge, could I just be heard in rebuttal,

18  because --

19          THE COURT:  Well, just --

20          MS. TATTER:  -- of -- it's our burden?

21          THE COURT:  Just a minute.  Let me straighten this out

22  first.  I'm going to have the -- what you gave me marked as

23  defense exhibit -- what number it is going to be?

24          MS. TATTER:  I think we ended with G.

25          THE COURT:  I'll tell you what.  I'm just going to put

1    a temporary exhibit sticker on it now, because I'm going to go

2    read this stuff before we go any further.  So this -- I think

3    you already have an H.

4         MS. TATTER:  H.  This would be I and J.

5         THE COURT:  G -- I and J.  And did you want to mark

6    yours as a single exhibit, Ms. Renschen, or do you want to mark

7    it as multiple exhibits?

8         MS. RENSCHEN:  I would ask to mark it as a single

9    exhibit.

10        THE COURT:  All right.  And what's your exhibit?

11        MS. RENSCHEN:  Number 1.

12        THE COURT:  Exhibit number 1.  All right.  I'll hear

13   from you very briefly, Ms. Tatter, then we'll take a brief

14   recess and look at this additional material, which I haven't

15   seen before.

16        MS. TATTER:  Judge, I think the prosecutor made an

17   argument on the case in general and the bad behavior of adults

18   with children.  And I agree, that's the crime and it's bad, and

19   there is an experiential difference in people, and it's

20   illegal.  But what -- this enhancement in 2A3.2(b) says that

21   some degree of undue influence of the minor to engage in

22   prohibited sexual conduct.  So I think the focus needs to be on

23   2004, July and August.  It is true Mr. Purviance --

24        THE COURT:  Well, that -- now, excuse me just a minute.

25   Why is that so obvious?  It does seem to me that the entire

1  period that he had communications with her is a period during

2  which he took active steps that could have influenced her.  I

3  mean, it's true, there's no doubt that these sexual predators

4  groom kids, and sometimes it takes a long time to do it.  Why

5  are you asking me to look only at this small slice of time?

6         MS. TATTER:  Because the prosecution has no evidence of

7  these kind of sexual conversations until the summer of 2004, at

8  the time the minor was also engaged in virtual sex with other

9  people on the Internet.

10         THE COURT:  All right.  So you're asking me to assume

11  then -- and maybe I have to -- that the -- that all of the

12  contacts between them prior to that were about topics other

13  than sex?

14         MS. TATTER:  I don't think the prosecution can show

15  that it's predatory, that it's pushy, it's just chats about

16  school and work and family and music.  And the sexual aspect

17  comes in the spring-summer of 2004.  And the chat that is

18  Exhibit H with Todd is 6/27/04.  And I think the experience --

19  as the prosecutor said, this is experiential.  And the -- this

20  minor did have experience in the summer with people other than

21  this person, and this minor had experience in dealing with

22  adults.  Her language is very mature and she's very successful

23  in communication.  She's not a pushover.

24         The prosecutor mentioned the cell phone which was

25  provided after.  And I think the guideline really needs the

1  Court to look at what influenced her to engage in the

2  prohibited sexual conduct which was in August of 2004, and

3  focus on that particular time -- especially since there's a

4  paucity of evidence of sexual banter or anything before the

5  summer of 2004.

6        THE COURT:  All right.  Just quickly, Ms. Renschen, you

7  agree that you don't have any transcripts of sexual

8  communications prior to that time?

9        MS. RENSCHEN:  No, I don't agree.  I think that the

10  exhibit -- the first two e-mails that I gave you are from May

11  10th and May 20th of 2004.  And it's very clear from --

12        THE COURT:  All, well, that may be just --

13        MS. RENSCHEN:  -- those conversations --

14        THE COURT:  -- a matter of terminology.  She said

15  spring and summer, and May is either spring or summer.  Do you

16  have anything before that?

17        MS. RENSCHEN:  The conversations in May indicate that

18  there have been conversations and has been sexual activity

19  before that time.

20        THE COURT:  All right.  I'll go read these documents

21  now, then.  We'll take a brief recess while I look at the

22  additional material that the parties have provided.

23        THE CLERK:  All rise.  This matter stands in brief

24  recess.

25        (Court recessed at 9:16 a.m., until 9:54 a.m.)

1          THE CLERK:  All rise.  His Honor the Court, this United
2     States District Court is again in session.
3          THE COURT:  Please be seated.  I'm going to give
4     Exhibits I and J and Number 1 to the clerk and they can be
5     marked officially with an appropriate exhibit sticker later in
6     the proceeding.
7          I have read those additional materials and I've also
8     considered the arguments made by counsel.  Both arguments were
9     very well done and I thought were excellent efforts to
10    illustrate the points that each lawyer thought were -- was
11    important.
12         As the parties have noted, there is no case law
13    interpreting the matter in dispute.  So in resolving the issue,
14    I start with the application notes to Guideline Section 2A3.2.
15    With respect to the relevant subsection, subsection (b)(2)(B),
16    the application notes indicate that the Court should, quote,
17    closely consider the facts of the case to determine whether a
18    participant's influence over the victim compromised the
19    voluntariness of the victim's behavior, close quote.
20         The application note also instructs that where, as
21    here, the age differential is at least 10 years, there is a
22    presumption, though it be rebuttable, that the defendant unduly
23    influenced the child.
24         I've considered the facts as reflected in the
25    presentence report and in all of the exhibits provided by the

1    parties.   While Ms. Tatter is correct to say that by late June

2    of 2004, the child had demonstrated considerable sexual

3    behavior over the Internet, there is also ample evidence that

4    during the summer of 2004, if not much earlier, defendant was

5    leading her along the path that eventually led to actual

6    physical sex.   And it appears to me that it is reasonable to

7    conclude that in terms of having actual physical sex with

8    another person, defendant did compromise the voluntariness of

9    the child's consent.   Certainly the evidence is not sufficient

10   to overcome the presumption, so I find that the two-level

11   upward adjustment is appropriate.

12           The other two objections are important to the Court's

13   exercise of sentencing discretion under 18 United States Code

14   Section 3553(a), specifically for the application of Section

15   3553(a)(1).   However, they do not bear on the guideline

16   calculation, so let me state for the record that based on the

17   findings of fact I've made thus far, the guideline offense

18   level is a level 25 and the guideline criminal history category

19   is a level 1.   This yields an advisory sentencing range of from

20   57 to 71 months of imprisonment.

21           All right, at this time I'd like to hear from counsel

22   regarding paragraphs 54 through 60, which relate to the

23   individual identified as C.A., and then later we'll take up the

24   paragraph relating to T.W.   Ms. Tatter.

25           MS. TATTER:   Judge, I'd first like to address the