RECEIVED

ORIGINAL

DEC 7 2007

CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ALASKA

3  UNITED STATES OF AMERICA,      )    Case 3:06-cr-00040-JWS
                                  )
4          Plaintiff,             )    Anchorage, Alaska
                                  )    Wednesday, January 3, 2007
5      vs.                        )    8:36 o'clock a.m.
                                  )
6  BROCK PURVIANCE,               )
                                  )
7          Defendant.             )
                                  )    **IMPOSITION OF SENTENCE**
8  _____
                **PARTIAL TRANSCRIPT OF PROCEEDINGS**
9
            BEFORE THE HONORABLE JOHN W. SEDWICK
10             UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:        AUDREY RENSCHEN, ESQ.
                              Assistant U.S. Attorney
13                            U.S. Attorney's Office
                              222 West 7th Avenue, #9, Room 253
14                            Anchorage, Alaska  99513-7567
                              (907) 271-5071
15
    For the Defendant:        SUE ELLEN TATTER, ESQ.
16                            Assistant Defender
                              Federal Defender's Office
17                            601 West 5th Avenue, Suite 800
                              Anchorage, Alaska  99501
18                            (907) 646-3400

19  Probation Officer:        TIM ASTLE
                              U.S. Probation/Pretrial Services
20                            222 West 7th Avenue, #48, Room 168
                              Anchorage, Alaska  99513-7562
21                            (907) 271-5494

22  Court Recorder:           APRIL KARPER
                              U.S. District Court
23                            222 West 7th Avenue, #4, Room 229
                              Anchorage, Alaska  99513-7564
24                            (907) 677-6102

25

exhibit 3



*A & T TRANSCRIPTS*
*(817) 685-7556*

1       **ANCHORAGE, ALASKA – WEDNESDAY, JANUARY 3, 2007**

2

3          (Call to Order of the Court at 8:36 a.m.)

4          (Defendant present)

5              THE CLERK:  All rise.  His Honor the Court, the United

6    States District Court for the District of Alaska is now in

7    session, the Honorable John W. Sedwick presiding.  Please be

8    seated.

9              THE COURT:  Good morning.

10             MS. RENSCHEN:  Morning.

11             MS. TATTER:  Good morning, Judge.

12             THE COURT:  We're gathered here this morning for

13   proceedings in an Anchorage criminal case.  It's number 3-06-

14   cr-40, *United States versus Brock John Purviance*.  Are the

15   parties prepared to proceed?

16             MS. RENSCHEN:  Yes.

17             MS. TATTER:  Yes, Judge, assuming that there are no

18   witnesses to be called.

19             THE COURT:  My understanding is that the government is

20   planning to call witnesses to testify.

21             MS. RENSCHEN:  Your Honor, having reviewed the matter

22   after receiving Ms. Tatter's sentencing memorandum, I no longer

23   think it's necessary to present the witnesses --

24             THE COURT:  Very well.  Well, that's --

25             MS. RENSCHEN:  -- earlier --

1    THE COURT:  -- your decision.

2    MS. RENSCHEN:  However, I will be presenting some

3  rebuttal to Ms. Tatter's presentation as to the undue

4  influence.  It's my understanding that she's going to be

5  presenting some additional argument and testimony on that.

6    THE COURT:  Well, let me make sure I understand.

7  You're both going to have ample opportunity to argue.  Are

8  either of you planning to present testimony?

9    MS. TATTER:  No.  My parent -- my client's parents

10  would like to address the Court, as I assume the prosecution's

11  parents would like to also.  But that's not testimony.  That's

12  simply --

13    THE COURT:  All right, well --

14    MS. TATTER:  -- addressing --

15    THE COURT:  -- I'll certainly hear from them.  But you

16  don't have any witnesses, ma'am?

17    MS. TATTER:  No, I don't.

18    THE COURT:  And you don't have any witnesses?

19    MS. RENSCHEN:  I don't, Your Honor.  I do have some

20  materials, some of the on-line conversations between the

21  defendant and the victim that I would like the Court to be

22  aware of.

23    THE COURT:  All right.  All right, well, then it would

24  appear that we're -- we should be prepared to proceed at this

25  point.  We're here this morning because Mr. Purviance pled

1  guilty pursuant to a plea agreement to one count of interstate
2  travel to engage in illegal sexual contact, in violation of 18
3  United States Code Section 2432.  That is a class B felony.

4        A presentence report has been prepared.  The only
5  information withheld from the presentence report consists of a
6  supplemental coversheet with two attachments.  The first
7  attachment is a victim impact statement, dated November 14,
8  2006, from Kimberly H., who is the mother of the child involved
9  in the defendant's crime.  The second attachment is a letter
10  from a licensed clinical social worker named Christy Lee
11  Williams, reporting her observations of the child victim based
12  upon a course of outpatient counseling which began on August
13  24th, 2005.

14        In order for the Court to make use of these materials
15  at sentencing, Federal Rule of Civil -- Criminal Procedure
16  32(i)(1)(B) requires that a summary of the materials be given
17  to the defendant as well as to counsel for the government.
18  However, these materials were provided to the Court on the
19  condition that they would not be disclosed to the defendant.
20  That makes it impossible for me to make use of the materials
21  themselves.  It may be noted, however, that much of what is in
22  them overlaps the information in the presentence report and in
23  the parties' own sentencing papers and exhibits.  So while I
24  cannot rely on the two attachments and will not do so, I am
25  able to rely on some of the same information because it is

1  available from other sources to which the parties do have

2  access.

3          Mr. Purviance, have you read the presentence report?

4          THE DEFENDANT:  Yes, I have, Your Honor.

5          THE COURT:  You can move that microphone a little

6  closer if you like.

7          THE DEFENDANT:  Okay.

8          THE COURT:  And have you discussed it with your lawyer?

9          THE DEFENDANT:  I'm sorry, what?

10          THE COURT:  Have you discussed the presentence report

11  with your lawyer?

12          THE DEFENDANT:  Yes, I have.

13          THE COURT:  I've read the presentence report in the

14  parties' sentencing materials.  Based upon the information

15  available, I accept the plea agreement at this time.

16          When determining the sentence to be imposed, I will

17  consider the factors specified in 18 United States Code Section

18  3553(a), which requires me to make findings of fact for use in

19  application of that statute as well as for application of the

20  advisory guidelines published by the United States Sentencing

21  Commission.

22          The United States made no objections to the presentence

23  report.  Defendant made a number of objections.  Two of them

24  are easily resolved.  The others will require further argument

25  from the parties before they can be resolved.

1    The first objection we can resolve now is the

2 description in paragraph 33 of photographs depicting the

3 defendant, the victim, another minor female, or some

4 combination of those people.  The probation officer's

5 adequately explained why the description is in his addendum, so

6 that objection is overruled.

7    The next readily resolved objection is to paragraph 53,

8 which is that the minor females mentioned there were not

9 actually minors when they were interviewed.  I agree that the

10 paragraph is awkwardly written, but when read in context with

11 the following paragraphs, I think it is clear enough that C.A.

12 and T.W. were minors when they had initial contact with Mr.

13 Purviance but were no longer minors when they were interviewed.

14 So this objection's also overruled.

15    Defendant has made more substantive objections and ones

16 which are of greater consequence.  The first of these is to

17 paragraph 42, which states that defendant unduly influenced the

18 victim and so is subject to a two-level upward enhancement

19 under Guideline Section 2A3.2(b)(2)(B).  Defendant also objects

20 to the statements reported in paragraphs 54 through 69, which

21 would provide a basis for concluding that defendant has a

22 history of inappropriate behavior with minor females.

23    Before we consider those objections, let me say that I

24 find all of the other statements of fact in the presentence

25 report to be supported by a preponderance of reasonably

1  reliable evidence, adopt them, and make -- in my findings of

2  fact for this proceeding.  In addition, based on the numerous

3  letters from defendant's friends, I also find these facts:

4  Defendant is an accomplished musician with a stable work

5  history.  Defendant's friends saw no evidence of inappropriate

6  behavior by him with minors.  Defendant was highly regarded by

7  his friends, who all professed to be surprised by the crime he

8  committed.

9       All right, at this time I'd like to get the objection

10  to paragraph 42 resolved.  So, Ms. Tatter, I'll hear from you

11  and then I'll hear from Ms. Renschen.  And at this time I'm

12  asking only for argument respecting paragraph 42.

13       MS. TATTER:  Judge, undue influence is a special

14  enhancement to -- that raises the level of having sex with a

15  minor.  The base level is a serious crime, crossing state lines

16  to engage in illegal sex with a minor.  So there must be

17  something to take it beyond most cases.  And I think it's

18  analogous to the enhancement for being a teacher or a custodian

19  of a minor, which is a four-level enhancement, and then there's

20  a two-level enhancement for undue influence presumed when the

21  person's more than 10 years older, but rebuttable.

22       So not every incident of sex with a minor is going to

23  be subject to undue influence, although many, many cases where

24  this a -- an age disparity, there could be undue influence.

25  And there is no law that the prosecutor or I have been able to

1  locate at this guideline, undue influence.  But I think the
2  language of the guideline makes it fact-specific to this case.
3  The Court has to look at the parties at the time the illegal
4  sex took place and say, was this person pushed into doing
5  something she didn't want to do; was compulsion --
6  psychological compulsion brought to bear.

7        And I think you look at two things.  You look at -- I
8  considered subpoenaing the minor, but I think that was a bad
9  idea, because the relevant time period is 2004, August, when
10 the time of the illegal act occurred.  In the chats, in the e-
11 mails which we've been provided, not only by the government but
12 by the key logger which the father installed on the girl's
13 computer, it -- it's apparent to us and I hope to the Court
14 that this was a person who was interested in this kind of
15 activity.  She wasn't hesitant.  Her will wasn't overborne.

16       I think you look at her and you look at what language
17 the defendant used, both.  We gave the Court some chats in
18 which she was in a chat room, involved in virtual sex with
19 somebody named Todd.  But there are others.  There's Brian and
20 Mike -- I have two packages of conversations with them.  At the
21 same time as Brock Purviance is talking to her about music,
22 other people are talking to her about very explicit sexual
23 material, giving her directions, and she's accepting them.
24       Now, that's not to say that my client didn't encourage
25 sexual activity.  But no -- not overbearing will.  There's a

1  lot of this activity that would be admissible at a trial or in
2  a -- in any consideration of a minor having sex, but for the
3  enhancement.  The enhancement means that there was something
4  overbearing, pressured, in this case.

5        For example, if the person were shy and disabled and
6  obese and subject to all kinds of problems and lived at home
7  and had mental problems, and was just so eager to have
8  connections, that might be a situation where there was
9  overbearing behavior.  Or if there was great pressure.  But I
10 think you need to look at the fact that this was a minor who
11 was willing to engage in this activity and in fact who was
12 chafing at restrictions and on the Internet all the time, hours
13 and hours and hours in these chat rooms where people were
14 engaging in much more explicit activity than we have evidence
15 of Mr. Purviance at that time.

16        Other evidence of lack of undue influence is in the
17 nature of the meeting itself.  My client did engage in the e-
18 mail that the prosecutor quoted, saying, "Why don't you throw a
19 tantrum?  Why don't you just tell your parents that you deserve
20 to get out of the house once in a while?"  Notably, this minor
21 didn't take that suggestion.  She arranged another plan that
22 was covert, that was clever and under the radar.  She didn't
23 have a confrontation.  She arranged to stay with her friend.
24 She had to do the groundwork, even though it was to my client's
25 advantage and he approved of it.  She clearly had the autonomy

1  to figure this out.

2          So I don't think in the nature of this particular case

3  there is undue influence the way the guideline intends.  I

4  think there has to be some kind of either compulsive behavior,

5  pushing, overbearing, or some real resistance on the part of

6  the young woman.

7          So we have prior sexual activity on the Internet, no

8  compulsion in the fact situation in this case.  We have the

9  minor's own descriptions in the e-mails that the Court has seen

10 and many, many that the prosecution I'm sure will not dispute.

11 She's articulate, she's intelligent, she's not somebody who's

12 easily pushed around.  She chafes at restrictions of her school

13 or her family, she criticizes things.  She's really a free-

14 thinker.  She wasn't like part of the ordinary high school teen

15 spirit.  She was interested in music, she's interested in

16 videos and films, and you can see from her expression that she

17 must have a high IQ and she must be a very deep thinker for her

18 age.

19          So it's not somebody who got -- was easily pushed

20 around and who got overborne.  Her current expression is that

21 she's still on the Internet in a My Space situation, Exhibit H,

22 meeting people.  She's not afraid of life.  She -- her handle

23 is SOS, So Overly Sexy.  And her photograph is there.  And it's

24 not -- she's not a fearful, hesitant person.

25          In this set of facts, where, as you can see, and I'm

1   sure the prosecution won't dispute, there are -- these are nice

2   pictures, they're pretty.  The people aren't salaciously

3   embracing.  They're in a -- woods with the friend J.S., and the

4   sunset is coming down, and they're nice to each other and

5   they're compassionate.  And it isn't a devious, angry,

6   compulsive manipulation of an unwilling person.

7       I think the record that we've presented -- and I have

8   extra chats of other incidents of virtual sex which I would

9   like to supplement the record with.  They're from the key

10  logger that the government provided.

11      MS. RENSCHEN:  What do you want me to do with them?

12      MS. TATTER:  I would just like to submit them to the

13  Court if --

14      THE COURT:  You may do that.

15    (Side conversation)

16      THE COURT:  Thank you.

17      MS. TATTER:  One is conversations with someone named

18  Mike and one is conversations with someone named Brian.  And I

19  submitted conversations with someone named Todd.

20      THE COURT:  Well, let me ask you this.  When did these

21  conversations you've just given me take place?

22      MS. TATTER:  Pardon?

23      THE COURT:  What date did they -- there -- there's a --

24  there's an --

25      MS. TATTER:  This is --

1            THE COURT:  -- hour but there's no date.

2            MS. TATTER:  The top of it is in 2004.

3            THE COURT:  All right.  Where it says the file, is that

4     the date, 06/27/04?

5            MS. TATTER:  It's in -- yes.

6            THE COURT:  So that would be -- all right, June 27th,

7     2004.  Looks like -- are they all that same date?

8            MS. TATTER:  I don't think so.  I think they're

9     chronological.

10           MS. RENSCHEN:  Actually, they are --

11           MS. TATTER:  (Indiscernible) the numbers --

12           MS. RENSCHEN:  They are all on that date.

13           THE COURT:  So far that's all I'm seeing.

14           MS. TATTER:  Okay.

15           THE COURT:  So there was a lot of chatting going on at

16    that time.  And am I understanding this correctly, that it's

17    the conversation with Brian and a conversation with Mike?  I

18    mean, it's in and out, or --

19           MS. TATTER:  In and out, yeah.

20           THE COURT:  -- all three of them talking?

21           MS. TATTER:  All three of them are talking.  And --

22           THE COURT:  Oh.

23           MS. TATTER:  Except they're two separate.  I think what

24    happened is she went offline with Brian and she went offline

25    with Mike, and then back into the chat room at various times.

1          THE COURT:  All right.

2          MS. TATTER:  And the point of this is that the minor

3  was interested and active.  It's not determinative any more

4  than a particular statement of my client is determinative.  He

5  certainly was trying to be flirtatious in urging her, but in

6  view of the fact that this is an enhancement, all the

7  circumstances here suggest that this was mutual activity, even

8  though there was a age disparity, that the relationship itself

9  was not coercive during the relationship.

10          THE COURT:  All right, thank you, Ms. Tatter.  I'll

11  hear from Ms. Renschen.

12          MS. RENSCHEN:  Your Honor, may I approach?  I have some

13  materials for the Court as well.

14          THE COURT:  You may.  I gather --

15          MS. RENSCHEN:  And I --

16          THE COURT:  -- Ms. Tatter's been --

17          MS. RENSCHEN:  I've provided --

18          THE COURT:  -- given copies?  Yeah.

19          MS. RENSCHEN:  -- copies of --

20          MS. TATTER:  Yes.

21          MS. RENSCHEN:  -- everything (indiscernible).

22          THE COURT:  Thank you.

23          MS. RENSCHEN:  Your Honor, I'd ask the Court to keep in

24  mind something that I think is basic for the kind of offense

25  that the Court is presented with here.  And that is that all of

1    us are shaped by our experiences.  And when those experiences

2    happen, they have a great deal to do with our later life.  I

3    think that's one of the main reasons that we do our best as a

4    society to protect our children from things that are adult and

5    for which they are not equipped either emotionally or

6    intellectually or experientially.

7         I think in this particular case it's important to keep

8    in mind the time frame over which Mr. Purviance was conversing

9    with this child.  One of the materials that I handed you, which

10   is after the first clipped material, is an e-mail from Mr.

11   Purviance in which he says to the child -- he makes a reference

12   to another e-mail that he had forwarded to her, and he admits,

13   "That means we were talking before September 13th, even though

14   there was a break in there.  I bet anything it's been more than

15   a year now."  And that e-mail is dated August 3rd of 2004,

16   which means a year prior would have been August 3rd of 2003,

17   when the child would have been 13 years old.

18        I think that's significant.  I think it's important to

19   note that the arguments that Ms. Tatter has made are based on

20   where the child is now, where the child was on the date when

21   the defendant traveled to have sex with her, and I don't think

22   that where she was on those dates is the same place as where

23   she was when she began speaking with the defendant.

24        As an example, I'd refer the Court to the e-mail dated

25   May 10th of 2004.  That is a response by the child to questions

1    that Mr. Purviance sent to her.  And that series of questions

2    indicate -- and I'm going to go through and read the questions

3    so that the Court knows how Mr. Purviance actually formulated

4    his conversations and hooked her into the conversations.

5           Number 1:  "When it first came up, you said you wanted

6    to wait until you were married until you had sex.  Now you've

7    said you want to be with me now.  And we're not married, are

8    we?  Why did you change your mind?  Are you sure?  If so, what

9    makes you sure?"  That's the first indication that there's been

10   a movement on her part that even he recognizes from the

11   conversations.

12          Number 2:  "Does it bother you or strike you as being

13   wrong in any sort of way when we talk about sex?  Why or why

14   not?"

15          Number 3:  "Does it bother you or strike you as being

16   wrong in any sort of way when I ask about your body?  Why or

17   why not?"

18          Number 4:  "You've said that the pics I sent to you

19   didn't strike you as being bad or good, but since, you've made

20   jabs at me for having them, which really are on disk that a

21   friend gave me, no joke.  I think you even wanted me to explain

22   it to you or something.  Do you really think it's okay?  Why or

23   why not?"  The child then goes on to refer to the pictures, and

24   it -- it's apparent that they're pictures -- nude pictures of

25   the defendant.

1    Number 5:  "How do you feel about the more recent stuff

2  we've done on the phone?"  And I think her answer is

3  particularly important:  "I've actually liked it a lot, if

4  that's a good thing or not.  It's weird.  Basically everything

5  that we have done stood against all that I used to believe in.

6  But it doesn't feel wrong, it feels right.  It makes me feel

7  really close to you and it turns me on a lot.  You probably

8  could tell that, though."

9         He then asked her how she feels about "the idea of us

10  doing stuff on camera for each other."  She talks about

11  nervousness.  Finally, the last two questions:  "Do you think

12  having me being way older and super-far away is going to have

13  any impact on your day-to-day happiness?  If so, what?  Do you

14  think us will take away your childhood?  Explain."  She

15  explains, "Well, in a sense yes, and in a sense no.  In a sense

16  yes, because I don't know many children that lose their

17  virginity -- well, I do, but not normal children, ha-ha.  In

18  the second sense, no, I don't.  I will still have my childhood

19  whether I'm with you or not.  It'll always be there.  You can

20  be an adult and still be living in your childhood.  It's just

21  how it is -- shrugs."

22         Later that month, the defendant sends an e-mail to her.

23  That one is dated May 30th.  And in there he talks about his

24  feelings about her and he goes on to describe her and says,

25  "What is it about you?  In short, you're a deeply beautiful

1  person.  You're one of the gifted people who was born with a

2  good sense of your place, where you are, how you fit in."  He

3  goes on, he talks to her and in effect strokes her and tells

4  her how good she is and how beautiful she is and how interested

5  he is in her, which at the time, she's a 14-year-old child, and

6  a 14-year-old child that this defendant has already spent a lot

7  of time talking about sexual activity.  And it's clear even in

8  May that her position in life, her thoughts about life, what

9  she believed about life, has changed dramatically because of

10  the influence that he has had on her.

11       And that I think exemplifies that adjustment of undue

12  influence.  That's why there's a presumption when an adult is

13  10 years or more older than the child that there's undue

14  influence.  But it's not a situation of equals.  It's not a

15  situation of people who are on the same intellectual plane or

16  the same emotional plane or the same experiential plane.

17       And it's specifically important to recognize what Mr.

18  Purviance's prior experience has been and practice that he's

19  had in talking to 14-year-old girls online.  He did not dispute

20  in any of the objections that he contacted T.W. when she was 14

21  years old and talked to her online, and later became involved

22  in a sexual relationship with her when she was 17.  He did not

23  deny or object to the fact that he contacted a 14-year-old girl

24  in Colorado and that he went to her house and had sex with her.

25  Those are experiences that he's had as an adult, talking to

1  children.

2          This child in Alaska didn't have those experiences.

3  Before she started talking with the defendant, she had not

4  talked to people about sex on the Internet.  She had not

5  imagined having sex.  It was only after the conversations that

6  he had, after the questions that he asked her, after he drew

7  her out and engaged her.  At that point, she was very

8  malleable, as any child is on the Internet at that age.  And I

9  think it's important to recognize that what he said and did

10  with her made her willing ultimately to have sex with him.

11          The other matters that I've prepared for the Court is

12  an August 3rd, 2004 e-mail where the defendant pressures her,

13  does it very gently but nonetheless establishes pressure but

14  tells her, "It's going to be expensive for me to fly to Alaska;

15  I guess there isn't such thing as a cheap fare to Anchorage.  I

16  found some around $300.  I definitely want to speak with you

17  before I buy my ticket.  I'm not going to hold you responsible

18  for me having a good time while I'm there.  The only thing I'll

19  hold you accountable for is at least making sure we can meet

20  up.  Like you said, there's a chance we might feel differently

21  toward each other after we meet.  I'd be bummed if that

22  happened, but at the same time, I guess it's better to find out

23  now."

24          Then he goes on and talks to her and asks her about

25  what her ideas and concerns and fears are, and he again brings

1   up the money and says, "Well, I know $300 isn't much.  It'll
2   end up being to 500 to $600 after lodging, car, and food.  But
3   it's a lot to me right now.  At the same time, waiting is
4   driving me crazy, so it's -- I think it's something I should
5   do.  As I said, I won't hold you responsible for one penny of
6   it, no matter how things go.  At the same time, I also don't
7   want to make this commitment until I know you've thought this
8   through thoroughly and you're sure about it."  And then he goes
9   in to take a shower and he gets back to her and asks if she got
10  the e-mail, and she says, "Yeah, I'm still thinking."  And he
11  says, "Coolio, right on.  I'll be here for a bit.  I guess just
12  send your thoughts to me whenever you're ready."
13          She responds, "I don't know.  I'm not sure.  I would
14  love if we met up and stuff, but I guess I hate not being able
15  to guarantee that we can do that.  I mean, things happen and, I
16  don't know, I can see it working but I can also see it not
17  working too.  It's like this huge conflicting argument I'm
18  having with myself.  It would be loads better in about a year
19  or two, just because I think it'd be easier to get away with
20  it.  But at the same time, I have a feeling it's not going to
21  get easier.  As long as the plan's good enough -- shrugs -- if
22  we go through with it, there's the chance of getting caught,
23  and I guess right now in that sense of getting caught is an
24  issue, it's not that bad, because they've already done what
25  they can for the most part.  The only thing they can do is take

1   away the computer and restrict the phone.  And it's not like I

2   use the phone much now.  The computer thing would suck, but

3   there's ways to work around that.  I guess I also feel guilty

4   you're coming up here.  Me, I know I'm being vague and stuff,

5   but it's loads easier thinking stuff than it is to write down

6   what you think, because it gets all muddled and the words seem

7   to disappear -- laugh out loud."

8        The defendant goes on and continues to talk to her

9   about that, asks her of a plan.  She says, "Oh, I suck at

10  plans."  He says, "Oh, you can do it."  And she says, "Well,

11  I'll think of something."  And he says, "Is that a yes?  Are

12  you going to keep thinking?"  She says, "Yeah, that's a yes --

13  laugh out loud."  And then he goes on and tells her that he

14  loves her.

15       After that, the next day, her father talks to her about

16  some of the things that he's seen that she's been doing on the

17  Internet, and she reports -- she, the child, reports to Mr.

18  Purviance that he's aware of things and he's been keeping tabs

19  on what she's writing and taking screen shots, that he noticed

20  that she had deleted 160 items from her e-mail.  And Mr.

21  Purviance says to her, "Are you able to delete items so they're

22  not readable by him?  Did he actually see that we were e-

23  mailing each other?  I mean, like know that it was me?"  And

24  says, "Yeah, your name was on it as responses and stuff.  I

25  thought that what I was doing right now was making it able so

1  that he couldn't, but now I'm not so sure."  And then they go
2  on and try to talk about how to get around her father and how
3  they're going to make sure that he doesn't learn anymore.  And
4  he points out -- he says, "Odd, 163 items that were deleted,
5  the one he found was old, took from like a month ago or more.
6  There have been literally thousands since then."  And
7  everything we found in the computer forensics backs that up,
8  that they had literally almost 5,000 different conversations
9  that were documented and preserved in his computer.  That's
10 apart from anything that would have happened on a chat or an
11 Instant Message that would not have been preserved there.

12          The next day, August 5th, he again presses her and
13 says, "Any developments with the plan?"  She says, "Oh, I've
14 got a few ideas, not sure if they're that good though."  He
15 brings up, "Is your mom going to be out of town for a funeral?"
16 And she says, "Yeah, that was one of the ideas I had, the 20th
17 to the 23rd, she said."  He says, "Oh, that's too soon, I
18 think."  Then he says, "Maybe not.  Ah, never mind.  Those are
19 weekend days anyway.  Plus, if your dad is home all the time
20 anyway, what difference does it make?"  Then she says, "Laugh
21 out loud -- the other is some weird-ass plan I don't think
22 would work.  It sounds like my dad might be out of town too.
23 Actually, it'll just be my brother at home -- shrugs -- but
24 there's bound to be people always coming over and stuff those
25 days.  I thought maybe I'd convince my mom to let me stay at

1  Jessica's those days she's gone -- shrugs."   "I could totally
2  make that happen then," Mr. Purviance says.   "Do you think I
3  can crash in your parents' room?"  She says, "Probably wouldn't
4  be a good idea to come over to my house, but if you want people
5  wondering why you're over and get all suspicious and stuff,
6  sure thing."  And then says, "Are they certain that those are
7  the dates they're going to be gone?  Do they have their tickets
8  yet?  I could fly those same days."  She says, "I'm not sure,
9  I'll check up on it."

10        So I read those to the Court to make it clear that this
11  is not a situation where we have a child who may be more
12  intellectually -- who may be intellectually stronger than the
13  adult she's with.  This is a situation where the defendant has
14  molded her over a period of years.  It was -- he had been in
15  contact with her on the computer for over two years before her
16  family found out about the fact that they had had sex and
17  before they found out that he had made two trips to Alaska to
18  have sex.  Despite the efforts that her parents made to take
19  away her computer privileges, take away her phone privileges,
20  he always worked around that.  He sent her a cell phone.  He
21  did things to get behind the back of her parents.

22        And that is undue influence.  That is a -- an adult
23  manipulating a child.  That is not two people who are standing
24  on equal ground, but it's an adult who has had experience in
25  talking with 14-year-old kids online.  He's had very successful

1 | experience talking to them and then later managing to have sex
2 | with them.  And I think that the Court needs to take into
3 | account where the defendant is coming from and where the child
4 | is coming from in order to see, in order to weigh and determine
5 | where there was undue influence.

6 | Essentially, the defendant is trying to put the blame
7 | on the child and say, "This child was just, you know, too
8 | mature.  I couldn't resist."  The fact of the matter is, he
9 | knew from the beginning that she was a child.  This wasn't a
10 | situation where the child was being untruthful with him or
11 | holding herself out as an adult and leading him on.  This was a
12 | situation right up front where she said, "I'm 14," and in fact,
13 | she was actually 13 at the point at which he contacted her
14 | initially, by his own admissions.  Those are all important
15 | factors for the Court to consider the undue influence.

16 | THE COURT:  Thank you.  I'm going to have these --
17 | MS. TATTER:  Judge, could I just be heard in rebuttal,
18 | because --
19 | THE COURT:  Well, just --
20 | MS. TATTER:  -- of -- it's our burden?
21 | THE COURT:  Just a minute.  Let me straighten this out
22 | first.  I'm going to have the -- what you gave me marked as
23 | defense exhibit -- what number it is going to be?
24 | MS. TATTER:  I think we ended with G.
25 | THE COURT:  I'll tell you what.  I'm just going to put

1   a temporary exhibit sticker on it now, because I'm going to go

2   read this stuff before we go any further.  So this -- I think

3   you already have an H.

4         MS. TATTER:  H.  This would be I and J.

5         THE COURT:  G -- I and J.  And did you want to mark

6   yours as a single exhibit, Ms. Renschen, or do you want to mark

7   it as multiple exhibits?

8         MS. RENSCHEN:  I would ask to mark it as a single

9   exhibit.

10         THE COURT:  All right.  And what's your exhibit?

11         MS. RENSCHEN:  Number 1.

12         THE COURT:  Exhibit number 1.  All right.  I'll hear

13   from you very briefly, Ms. Tatter, then we'll take a brief

14   recess and look at this additional material, which I haven't

15   seen before.

16         MS. TATTER:  Judge, I think the prosecutor made an

17   argument on the case in general and the bad behavior of adults

18   with children.  And I agree, that's the crime and it's bad, and

19   there is an experiential difference in people, and it's

20   illegal.  But what -- this enhancement in 2A3.2(b) says that

21   some degree of undue influence of the minor to engage in

22   prohibited sexual conduct.  So I think the focus needs to be on

23   2004, July and August.  It is true Mr. Purviance --

24         THE COURT:  Well, that -- now, excuse me just a minute.

25   Why is that so obvious?  It does seem to me that the entire

1  period that he had communications with her is a period during

2  which he took active steps that could have influenced her.  I

3  mean, it's true, there's no doubt that these sexual predators

4  groom kids, and sometimes it takes a long time to do it.  Why

5  are you asking me to look only at this small slice of time?

6        MS. TATTER:  Because the prosecution has no evidence of

7  these kind of sexual conversations until the summer of 2004, at

8  the time the minor was also engaged in virtual sex with other

9  people on the Internet.

10       THE COURT:  All right.  So you're asking me to assume

11 then -- and maybe I have to -- that the -- that all of the

12 contacts between them prior to that were about topics other

13 than sex?

14       MS. TATTER:  I don't think the prosecution can show

15 that it's predatory, that it's pushy, it's just chats about

16 school and work and family and music.  And the sexual aspect

17 comes in the spring-summer of 2004.  And the chat that is

18 Exhibit H with Todd is 6/27/04.  And I think the experience --

19 as the prosecutor said, this is experiential.  And the -- this

20 minor did have experience in the summer with people other than

21 this person, and this minor had experience in dealing with

22 adults.  Her language is very mature and she's very successful

23 in communication.  She's not a pushover.

24       The prosecutor mentioned the cell phone which was

25 provided after.  And I think the guideline really needs the

1  Court to look at what influenced her to engage in the
2  prohibited sexual conduct which was in August of 2004, and
3  focus on that particular time -- especially since there's a
4  paucity of evidence of sexual banter or anything before the
5  summer of 2004.

6        THE COURT:  All right.  Just quickly, Ms. Renschen, you
7  agree that you don't have any transcripts of sexual
8  communications prior to that time?

9        MS. RENSCHEN:  No, I don't agree.  I think that the
10  exhibit -- the first two e-mails that I gave you are from May
11  10th and May 20th of 2004.  And it's very clear from --

12        THE COURT:  All, well, that may be just --

13        MS. RENSCHEN:  -- those conversations --

14        THE COURT:  -- a matter of terminology.  She said
15  spring and summer, and May is either spring or summer.  Do you
16  have anything before that?

17        MS. RENSCHEN:  The conversations in May indicate that
18  there have been conversations and has been sexual activity
19  before that time.

20        THE COURT:  All right.  I'll go read these documents
21  now, then.  We'll take a brief recess while I look at the
22  additional material that the parties have provided.

23        THE CLERK:  All rise.  This matter stands in brief
24  recess.

25        (Court recessed at 9:16 a.m., until 9:54 a.m.)

1    THE CLERK:  All rise.  His Honor the Court, this United
2  States District Court is again in session.

3    THE COURT:  Please be seated.  I'm going to give
4  Exhibits I and J and Number 1 to the clerk and they can be
5  marked officially with an appropriate exhibit sticker later in
6  the proceeding.

7    I have read those additional materials and I've also
8  considered the arguments made by counsel.  Both arguments were
9  very well done and I thought were excellent efforts to
10  illustrate the points that each lawyer thought were -- was
11  important.

12    As the parties have noted, there is no case law
13  interpreting the matter in dispute.  So in resolving the issue,
14  I start with the application notes to Guideline Section 2A3.2.
15  With respect to the relevant subsection, subsection (b)(2)(B),
16  the application notes indicate that the Court should, quote,
17  closely consider the facts of the case to determine whether a
18  participant's influence over the victim compromised the
19  voluntariness of the victim's behavior, close quote.

20    The application note also instructs that where, as
21  here, the age differential is at least 10 years, there is a
22  presumption, though it be rebuttable, that the defendant unduly
23  influenced the child.

24    I've considered the facts as reflected in the
25  presentence report and in all of the exhibits provided by the

1  parties.  While Ms. Tatter is correct to say that by late June

2  of 2004, the child had demonstrated considerable sexual

3  behavior over the Internet, there is also ample evidence that

4  during the summer of 2004, if not much earlier, defendant was

5  leading her along the path that eventually led to actual

6  physical sex.  And it appears to me that it is reasonable to

7  conclude that in terms of having actual physical sex with

8  another person, defendant did compromise the voluntariness of

9  the child's consent.  Certainly the evidence is not sufficient

10  to overcome the presumption, so I find that the two-level

11  upward adjustment is appropriate.

12      The other two objections are important to the Court's

13  exercise of sentencing discretion under 18 United States Code

14  Section 3553(a), specifically for the application of Section

15  3553(a)(1).  However, they do not bear on the guideline

16  calculation, so let me state for the record that based on the

17  findings of fact I've made thus far, the guideline offense

18  level is a level 25 and the guideline criminal history category

19  is a level 1.  This yields an advisory sentencing range of from

20  57 to 71 months of imprisonment.

21      All right, at this time I'd like to hear from counsel

22  regarding paragraphs 54 through 60, which relate to the

23  individual identified as C.A., and then later we'll take up the

24  paragraph relating to T.W.  Ms. Tatter.

25      MS. TATTER:  Judge, I'd first like to address the

1 | paragraphs related to Tricia Walker.  And --

2 | THE COURT:  All right.  Do you think it's important to
3 | take up Tricia Walker first?

4 | MS. TATTER:  Yes, because I think that's a clearer case
5 | for us.

6 | THE COURT:  Well, all right.  Then we'll consider
7 | paragraphs 61 through 69 relating to T.W.

8 | MS. TATTER:  There are significant indications which I
9 | think the prosecutor will not dispute that Tricia Walker lied
10 | to Agent Eckstein about significant things.  The first one is
11 | that she told Agent Eckstein that Mr. Purvance physically
12 | abused her, but the Mission Viejo police would not arrest him
13 | because she didn't have bruises.  And she told him this in a
14 | formal interview that he wrote up on FBI paper, a 302.

15 | THE COURT:  Yeah, I've seen your exhibits.

16 | MS. TATTER:  And then Mr. Johnson, my investigator, and
17 | Agent Eckstein got the actual report from Mission Viejo Police.
18 | And in -- what the Mission Viejo Police said is, "We did a
19 | report; it's not -- we didn't refuse to write a report."  The
20 | report was Ms. Walker's complaint that she thought Mr.
21 | Purvance was suicidal and she was worried about him committing
22 | suicide because they were breaking up, and that was the report.
23 | Not what she told Agent Eckstein.  And I think that casts a
24 | very harsh light on her other allegations about Mr. Purvance.
25 | She is a unhappy ex-girlfriend.  She lied to Agent Eckstein.

1      We just noticed another bald lie right now, because his

2  parents brought up her correspondence.  And the correspondence

3  is dated because it's in envelopes that are postmarked.  She

4  told Agent Eckstein that Brock was a very bad person, he did

5  all these wrong things, and she broke up with him about two

6  months following the 911 call which was the domestic violence

7  lie in December of '99, and that she permanently severed the

8  ties but that he proceeded to get in contact with her.

9      And yet, we have dated love letters of her from

10 February, March, May, and July 2000, months after she told

11 Agent Eckstein that he was too evil to live around.  So the --

12 and these are just things that have just come up.  You know,

13 but even in the -- that we just happened to notice.  And I

14 think the prosecution can't dispute that she lied about these

15 things.  And if she lied about these things, then she is very

16 uncredible, especially since she isn't here, and these are

17 confrontation issues.

18      The rest of her testimony is anti-Brock.  It's a --

19 very inflammatory.  And once you've got an informant, you know,

20 somebody whose hearsay is in the presentence report.  And we

21 know she's lied in two significant ways to the FBI.  I think

22 she's incredible as an informant and her information should be

23 backed out.

24      Now, lots of times people say there's -- hearsay is

25 okay in a presentence report, and it -- but it has to be

1   verified.  And sometimes it's verified by a police report.  In

2   this case, we've got it unverified by a police report and we

3   have her report to Agent Eckstein demonstrably false in at

4   least two respects.  And since she isn't here and since this is

5   emotional, angry rhetoric, I think it's very unreliable, too

6   unreliable for a presentence report.

7        Now, there's a few other things that I would like to

8   address about her.  But it's in context with whether or not

9   she's part of an Internet predator pattern.  And I don't think

10  this is -- I'm just making my presentence report objections

11  now.  I also don't think she fits into a girlfriend-from-the-

12  Internet pattern.  But I could reserve those objections.

13       THE COURT:  All right.  Well, let me hear from Ms.

14  Renschen respecting the proposition that's been pretty well

15  argued here that T.W. is pretty clearly a liar, so why should

16  we believe anything she has to say?

17       MS. RENSCHEN:  Judge, I guess I wouldn't come to that

18  conclusion that she's a liar.

19       THE COURT:  Well, do you dispute what she -- that she

20  lied --

21       MS. RENSCHEN:  I think --

22       THE COURT:  -- to Agent Eckstein?

23       MS. RENSCHEN:  I don't believe she did lie --

24       THE COURT:  All right.  Well --

25       MS. RENSCHEN:  -- to Agent Eckstein.

1      THE COURT:  -- that's fair enough.  You tell me why.

2      MS. RENSCHEN:  It's my understanding that she reported

3 what she believed was a domestic violence situation to the

4 police.  Agent Eckstein checked with the police.  Initially,

5 Ms. Tatter -- when this came up in the context of the detention

6 hearing, Ms. Tatter came up and said, "She's lying, she's

7 lying; we checked with the police and there's no report of this

8 at all."

9      Agent Eckstein went back and checked with the police,

10 and what she had done was investigated using the person's

11 married name versus her maiden name at that time.  Agent

12 Eckstein found that there was a report.  He checked with the

13 police and found that there had been a domestic violence

14 report.  It was categorized that way in the dispatch, but it

15 was written up in the format that spoke of the defendant having

16 cut himself with a knife.

17      I think it's very revealing that even in the report

18 that is filed, the defendant's manipulation of this situation

19 is apparent.  The police report talks about him -- he actually

20 told the police, according to that report, that he placed the

21 knife against his wrist to scare T.M. and never intended to

22 harm himself.  So that shows a manipulation of the system.  It

23 shows he manipulated the person that we now refer to as T.W.

24 when she reported the incident to the police.  So there -- I

25 think it's fair to say that there are some inconsistencies in

1   the report, but I don't think that the Court can conclude that

2   she lied about the report without having the officers available

3   who took the report and without having them here to --

4        THE COURT:  Well --

5        MS. RENSCHEN:  -- explain.

6        THE COURT:  All right.  But, nevertheless, there are

7   clearly some questions about the accuracy of what she told

8   Agent Eckstein, very substantial questions.

9        MS. RENSCHEN:  With regard to that.  And I think that

10  the remedy is that if the Court is not comfortable with that

11  report, that you exclude that paragraph, paragraph 66, that

12  refers to the domestic violence.

13       THE COURT:  Well, Ms. Tatter's point is that because

14  her credibility is in question, because she's not here, it

15  isn't reasonable for the Court to rely upon the hearsay.  And

16  there is some concern, because although it is proper to rely on

17  hearsay in a sentencing proceeding, there has to be some

18  indicia that it's reliable.  Now, there's also, at least it

19  appears to me, no doubt that there is a -- ill will between

20  T.W. and Purviance.  I don't know who's got the better of it;

21  maybe it's all his fault or maybe it's all her fault.  But

22  any -- we all know that where you have former boyfriends and

23  girlfriends or lovers, they sometimes say things that are

24  intended to harm the former partner.

25       MS. RENSCHEN:  But Court -- but the Court needs to keep

1  in mind that he has actually verified the most significant

2  aspects of her report, and that is that he contacted her when

3  she was 14 years old.  He contacted her on the Internet.  He

4  stayed in touch with her for two years on Internet

5  communication.  And he and she got together after she turned 17

6  and lived together.  There's --

7          THE COURT:  All right.  That's paragraphs what, 62 and

8  '3?  '2, '3, and '4?

9          MS. RENSCHEN:  62 and 63.

10         THE COURT:  Well, let me just ask at this point, Ms.

11  Tatter, Ms. Renschen indicates that you've effectively conceded

12  that 62 and 63 are accurate.  Is that right?

13         MS. TATTER:  No.  We dispute them.  And we believe that

14  they had a physical meeting, that her father brought her to --

15  they did meet in a chat room.  I'm not -- I don't have any

16  information about the age.  But when she was 16, her father

17  brought her to the Chicago Airport and physically met Brock,

18  and there was no more chatting, it was all -- they had a

19  telephone friendship.  And shortly before her 18th birthday,

20  they got together sexually.  And that's --

21         THE COURT:  All right, so 63 is not disputed, right?

22         MS. TATTER:  Well, we dispute the drinking alcohol.  In

23  fact, we have a witness that said -- I mean, she says she spent

24  a week with Brock and drank alcohol.  There -- Brock had a --

25         THE COURT:  All right.

1          MS. TATTER:  -- a male roommate at the time who said

2   that's not true.  I --

3          THE COURT:  All right, and you're also disputing that

4   he told T.W. he'd had sex with a 13-year-old named K.S.?

5          MS. TATTER:  Yeah, absolutely.  It's --

6          THE COURT:  All right.

7          MS. TATTER:  It's just fabrication.  And from an --

8          MS. RENSCHEN:  Judge, those objections --

9          MS. TATTER:  -- unreliable person.

10          MS. RENSCHEN:  -- were never made to the presentence

11   writer.  She simply -- she relied on the inconsistencies in the

12   domestic violence report and she said in the sentencing

13   memorandum that there were -- there was some dispute about

14   whether or not T.W. actually wanted to have contact with him

15   after their relationship ended.  The objections never went to

16   the contact when she was 14 years old using the Internet.  It

17   never went to the fact that she reported having sex with him

18   when she was 17.  It never went to her report that he had child

19   pornography on his computer and that he explained all that.

20          THE COURT:  Well --

21          MS. RENSCHEN:  None of that came out.

22          THE COURT:  Well, let me just stop you now.  I'm

23   looking at the addendum to the presentence report in which the

24   author of the report reflect -- or says that there was an

25   objection to paragraph 61 through 69.  Material about T.W.

1    should be removed because she has been proven to be untruthful

2    and unreliable.  So the objection goes to everything that she

3    said.

4          MS. RENSCHEN:  But at the same time, she has included

5    in her sentencing memorandum pictures of the defendant with

6    that person, showing -- documenting their relationship and

7    talking about how they met online on the Internet.

8          THE COURT:  Well, I think it's conceded they met online

9    on the Internet and that they had a relationship.  But --

10         MS. RENSCHEN:  And I think that their ages are --

11         THE COURT:  -- there's considerably more in those

12    paragraphs that are very damning for Purviance if -- or -- is

13    it Purviance or -- how do you pronounce --

14         THE DEFENDANT:  It is Purviance.

15         THE COURT:  Purviance.  If they're believed, that they

16    all appear to be based on what she said.  I mean, for example,

17    she says he told her he had sex with a 13-year-old.  She says

18    he had her drinking for a week.

19         MS. TATTER:  Right.

20         THE COURT:  Those are significant facts if they're

21    true.  But I'm having some concern about whether I can rely on

22    T.W.

23         MS. RENSCHEN:  Your Honor, I think that the significant

24    things that she has reported -- that he sought her out when she

25    was 14, that they had sex when she was 17 -- I think that those

1    are undisputed, and I think that those are the most significant

2    aspects of what she has reported.

3            MS. TATTER:  I do not concede Ms. Renschen's

4    characterizations.  We don't know if he sought her out or she

5    sought him out or they were in a chat room --

6            THE COURT:  The presentence report says they met in a

7    chat room.

8            MS. TATTER:  They met in a chat room --

9            THE COURT:  And is there any dispute about the date?

10           MS. TATTER:  I'm not sure of the age.  I have no

11   document.  My client --

12           THE COURT:  The date, 1994?

13           MS. TATTER:  -- didn't know.  I don't know that.  I do

14   know my -- and my client admits that they met when she was 16

15   in the airport in Chicago, and that's his first ability to date

16   that.

17           THE COURT:  All right.  Well, here -- here's my ruling

18   with respect to paragraph 61 through 69.  I find that only the

19   following statements are sufficiently supported by reasonably

20   reliable evidence, so I do adopt them.  First:  The defendant

21   did have contact with the minor T.W. in a chat room at some

22   point prior to the time he physically met her when her father

23   brought her to the Chicago Airport when she was 16 years old,

24   and that after she turned 17, T.W. and the defendant commenced

25   a relationship which included sexual activity and that they

1    were lovers.  Beyond that, I reject everything in 61 through

2    69.  I don't reject 61.  The FBI did interview her.  But

3    everything in 62 through 69 aside from what I've just stated.

4         All right, now, Ms. Tatter, if I can hear from you

5    regarding the other paragraphs that you objected to, which I

6    think are 50 -- 53 through 59 -- or 54 --

7         MS. TATTER:  The --

8         THE COURT:  -- through 59.

9         MS. TATTER:  54 through 59 are statements by a lady,

10   C.A., who's now not a minor either, to investigators.  And 60

11   is a statement of a friend of C.A. who says she told him these

12   things.

13        While Mr. Purvance did meet C.A. in 2005, and there's

14   evidence on his computer about that, he and I dispute the

15   earlier meeting in -- when she was 14.  And given the lack of

16   verification that -- this is again, she said -- I don't have a

17   demonstrable lie, but what we don't have is any documentation.

18   We don't have photos, chats.  They have seven hard drives of my

19   client.  They've got his conversations with many, many people

20   and they don't have any documentation of this relationship

21   before 2005.

22        We concede that they were friends in 2005 and they met

23   sometime before that.  And there's a photographic file on his

24   computer.  But there's no verification, no phone records, no

25   computer records, no contemporary plane tickets or any -- or

1   anything.  And given the things that the Supreme Court and the

2   Ninth Circuit have said about enhancing someone's sentence on

3   the basis of unverified information, I think this is another

4   statement -- it's not as clear as the one with Tricia Walker

5   because we have her in several overt lies and hostility, but

6   it's still unverified.

7        This is just not like a police report, where the police

8   respond and observe a real incident.  This is ex-girlfriends in

9   the past.  And she is an ex-girlfriend, because he did have a

10  relationship with her in 2005.  So I think again it's

11  unverified and it's not the standard that *Ameline* and the cases

12  require.

13       THE COURT:  All right.  Ms. Renschen.

14       MS. RENSCHEN:  Your Honor, there is documentation to

15  support the reports of C.A. that she met the defendant in a

16  chat room when she was 14 and had sex with him in Colorado at

17  that time.  Special Agent Eckstein interviewed both her father

18  and this friend and inquired about what they knew.  Both of

19  them report that at the time in 2000, she reported to them that

20  she had had sex with the defendant when she was 14.

21       She refers to that in her statement where she talks

22  about have -- her father having found out about it, that he was

23  very upset.  And so we have no claim -- this isn't a recent

24  fabrication, because we have two people back in 2000, her

25  father and this friend --

```
 1            THE COURT:  Well --
 2            MS. RENSCHEN:  -- that she reported --
 3            THE COURT:  -- I see G.D.'s statements here in the
 4   presentence report, but where are the statements from her
 5   father?
 6            MS. RENSCHEN:  Your Honor, I'm not certain.  I have a
 7   report that was made available early on in the case and I can
 8   put Special Agent Eckstein on the stand to report.  That was an
 9   oversight on my fault -- I didn't -- on my part.  I didn't
10   notice that he hadn't included that in the report until today.
11   The --
12            THE COURT:  Well, I think in the absence of the clear
13   contradiction that existed in T.W.'s case, it's appropriate to
14   hear Agent Eckstein's testimony then, because it's important to
15   know if Ms. -- who C.A. is -- statements are reliable or not.
16   They're very important.  At this point I'm not sure they're
17   sufficiently reliable.  So if you want to call Agent Eckstein,
18   I'll hear his testimony.
19            MS. TATTER:  Judge, I just generally object, on the
20   basis of 32.1.  I mean, there's rules, and all of this was out,
21   my objections were out, you know, weeks before.  And Rule 32.1
22   says the prosecutor needs to flag all the witnesses, the
23   defense does too, in the brief that you file seven days --
24            THE COURT:  Fair enough.  How do you respond to that,
25   Ms. Renschen?
```

1        MS. RENSCHEN:  Your Honor, if Ms. Tatter needs

2   additional time, I don't mind delaying this further if she

3   wants to review it.  All of this information has been available

4   from the beginning.  This -- there was testimony about this

5   during detention hearings in the State of Colorado as well as

6   before Magistrate Judge Roberts.  There are no new materials

7   here, and she's been aware of those --

8        THE COURT:  The --

9        MS. RENSCHEN:  -- corroborated statements from the

10  beginning.

11       THE COURT:  So there's no surprise --

12       MS. TATTER:  I was not aware of the father --

13       THE COURT:  -- but the --

14       MS. TATTER:  And Ms. Renschen should have objected --

15       THE COURT:  Excuse me, Ms. Tatter, just let me finish

16  my point here.  I think at every change of plea hearing I've

17  taken in 14 years, I have -- maybe not every one, but certainly

18  every one I can think of -- I've told the parties if they have

19  objections to the factual statements in the presentence report,

20  they have to bring it up with the author of the report and if

21  they don't do it, I won't consider them.  And then I cite the

22  rule.  And the rule says not only statements that are wrong,

23  but omissions.  Those are supposed to be called to the

24  attention of the author of the report.  And when that is done,

25  then when we get to these sentencing hearings, we don't have to

1  spend a lot of time on unanticipated issues.  And so I'm going

2  to retract what I ruled earlier.  I'm not going to hear from

3  Special Agent Eckstein, because there was no objection to the

4  failure of the author of the presentence report -- I'm not

5  suggesting it was a fault on his part, but he didn't include

6  something that the lawyer knew about, and the lawyer could have

7  called it to his attention and it could have been included if

8  appropriate or not, depending upon what the author decided to

9  do.  So that leaves you arguing about the reliability of C.A.

10 without anything further than G.D., I guess.

11         MS. RENSCHEN:  Not yet.  I have a copy of a letter that

12 C.A. wrote to the defendant.  It was I believe in the spring or

13 early summer of 2005, after she graduated from high school.

14 And I've --

15         THE COURT:  Now, he admits he met her in 2005 and he

16 had a relationship with her then.

17         MS. RENSCHEN:  I'm sorry, did I say 2005?  I misspoke.

18 It --

19         MS. TATTER:  The letter is undated.

20         MS. RENSCHEN:  Your Honor, the letter is from C.A.

21 after her graduation from high school in 2005, which occurred I

22 think sometime in May or June.  Within the context of the

23 letter, she refers back to the relationship that they have had

24 over the past five years.  And she says, "Even though we

25 haven't been around each other in five years and I wouldn't

1   even really know, I feel like I've known you for a long time.
2   I feel just close to you.  All the sex talk was great in a fun
3   way, exciting to the max.  And to talk about us kissing and all
4   the vivid pictures going through my mind was just overwhelming.
5   I really can't wait to see you and relax for a little while."
6   And then she goes on talking about wanting to get together with
7   him.  But this letter to him before they met in October to have
8   sex documents the prior relationship that she spoke of to the
9   presentence writer, to Agent Eckstein, and it documents the
10  report of the other witness, G.D., who also confirmed what it
11  is that she said.

12        So there is not only her statement, there is the fact
13  that she reported it exactly the same way back in the year 2000
14  when it happened, and then refers to it in a letter that she
15  sends him upon graduation.  So there is corroboration for her
16  statement in both of those forms, both by her letter and by the
17  statement made -- that she made to G.D. back in the year 2000.

18        THE COURT:  I -- I'm not sure Ms. Tatter's seen that,
19  at least not recently.

20        MS. TATTER:  I'd point out that there's no date and
21  there's no reference to any kind of external -- I don't know
22  where the prosecutor gets the date of the graduation or
23  whatever, but that's all external to this.  I'd agree with her
24  if this were dated or it had some concrete reference to when
25  President Ford died or something like that, but it's not.

1    THE COURT:  It would be an unusual letter to have

2 looked forward to the time when the president passed away.

3    (Side conversation)

4    MS. RENSCHEN:  Your Honor, included -- that handwritten

5 note was included in a card from C.A. to the defendant and it

6 included a picture of herself in a cap and gown.  This was

7 found -- if I could have just a second.  I apologize.  It

8 wasn't a cap and gown.  It was in sort of a prom dress.  And

9 she had her baby with her at the time, which is how Agent

10 Eckstein dated the photograph, dated the letter, went back and

11 found her and contacted her and inquired about this, and that's

12 when he learned about the relationship.  It was based on that

13 document that was found in the defendant's home, I believe,

14 during the execution of a search warrant in Colorado.  We don't

15 have the original here today.  We weren't able to get it from

16 the property and evidence section of the FBI.  They were closed

17 yesterday, and couldn't get it this morning before court began.

18    MS. TATTER:  And I'd just like to mention that we don't

19 have any information that we can concede that the things Ms.

20 Renschen just testified to are true -- how it arrived, how it

21 came, what picture was with it.  I don't have that information.

22    THE COURT:  Well, in any event, it was found in his --

23    MS. TATTER:  Yes.

24    THE COURT:  -- dwelling.

25    MS. TATTER:  And it's just what it says.  It's undated

1  and it doesn't refer to --

2          THE COURT:  All right.  Well, I think it's a close

3  question, but because I've got both the letter and the

4  statements given by G.D. to Agent Eckstein -- and I'm not quite

5  sure why we're calling an adult G.D.  What's his name?

6          MS. RENSCHEN:  His name is Gary Dockins.

7          THE COURT:  Gary Dockins, who's reporting the same

8  things essentially that C.A. corroborated to him what she told

9  Agent Eckstein.  So I think when you take all three of these

10 things, you've got C.A., who's got no apparent animosity to Mr.

11 Purviance -- indeed, from what little I see here, she still

12 thinks he's a wonderful person to spend time with; you've got

13 her letter, her own reports of things that are not in her own

14 interest to tell anyone; and G.D. confirming that she'd also

15 told him about it.  I -- I'm going to find that reasonably

16 reliable as sufficient to support my adoption of the findings

17 of -- in the paragraphs 54 through 60, so I will adopt them and

18 make them my findings of fact for purposes of this proceeding.

19         All right, that then brings us to that point where we

20 need to hear argument regarding what's an appropriate sentence.

21 But before we do that, I think it's appropriate to hear from

22 the parents and the -- of course the victim has a right to

23 speak, if she wishes to.  Let me first inquire, does the victim

24 wish to speak here today?

25         MS. RENSCHEN:  Your Honor, she is not here and --

1          THE COURT:  The parents can be considered --

2          MS. RENSCHEN:  -- the parents are here --

3          THE COURT:  -- victims as well.  But she doesn't want

4    to testify -- or speak?

5          MS. RENSCHEN:  Correct.

6          THE COURT:  All right.

7          MS. RENSCHEN:  Your Honor, I have taken appropriate

8    measures from the beginning when we were before Magistrate

9    Judge Roberts and also in Colorado, I believe, to keep the

10   identity of the child confidential.  And at the break I did

11   provide spelling of the parents' names, but I would ask that

12   they not be required to name themselves in open court, to help

13   protect the identity of the child.

14         THE COURT:  Any objection to that, Ms. Tatter?

15         MS. TATTER:  (No audible reply).

16         THE COURT:  All right, when they're -- when they speak,

17   they'll just -- they can just identify themselves by initials

18   and state their relationship to the child victim.  I guess I

19   should hear first from the parents of the defendant, then I'll

20   hear from the parents of the child.  There's a microphone in

21   the gallery there, sir.  If you'd like to just step up.  You

22   can bend the gooseneck -- all right, we'll hear first from Mrs.

23   Purviance.

24         MS. MUNOZ:  No, I'm Mrs. Munoz.

25         THE COURT:  Mrs. Munoz, I'm sorry.

1           MS. MUNOZ:  Yes.

2           THE COURT:  I -- yes, I -- forgive me, I knew that.

3           MS. MUNOZ:  That's all right.  That's all right.  Good

4    morning, Judge.  My name is Janet Sue Munoz, and I am from

5    Colorado.  I am Brock's mother.  I've known him for 30 years.

6    A little bit about myself.  I was born and raised in Iowa.  I

7    earned a bachelor's of science degree in P.E. and minored in

8    psychology from Upper Iowa University in 1972.  Married and

9    moved to Wisconsin.  And in 1976, my former husband and I

10   adopted Brock.  And in 1979, I -- we were -- my husband and I

11   were separated and our divorce was finalized in early -- of

12   1980.

13          And Brock and I then moved to Redlands, California,

14   where my brother lived and said to come and start over again.

15   So I moved to -- Brock and I moved to Redlands, California in

16   1981, where I met Fred, my husband, Frederick, shortly after we

17   had moved there.  And married Fred in March of '82.  And then

18   we became a blended family of six.  Fred had three children by

19   a previous marriage and I had Brock.

20          I did graduate work at San Diego State University in

21   the area of special education, with the emphasis on severely

22   handicapped.  I've taught for approximately 20 years, where all

23   of those were in special education.

24          I am now working in the profit -- or the public

25   relations in nonprofit organization Volunteers of America.  And

1  I assist adults 55 years of age and older -- or we say
2  better -- find volunteer positions in -- with 80 different
3  nonprofit and government agencies that are in partnership with
4  Volunteers of America.  And in this position I do a lot of
5  public speaking and recruiting.

6          Today, Judge, I'm here, naturally, to support my son
7  Brock.  I'm extremely disappointed in Brock's major error in
8  judgment.  It has been devastating for Fred and me.  We -- our
9  lives have changed drastically in the last eight months.
10  However, I have loved Brock throughout his life.  I love him
11  now and will continue to love him when he is released from
12  incarceration.

13          And I'll tell you one thing.  If I felt Brock was --
14  had victimized Ms. Doe or had been abusive, malicious, devious
15  toward her in any way, I would be sitting with the Does right
16  now, and Brock knows that.  We have that type of relationship.
17  We've been on the opposite ends of situations before and we
18  know where each other stands.  But I know Brock very well, and
19  I'm certain he did not get involved in the relationship with
20  Ms. Doe to victimize her.  In fact, I think Brock would have
21  done anything for Ms. Doe to please her and to make her happy.

22          I am also here to give you information about Brock that
23  I hope will influence your conclusion that Brock has a lot to
24  offer his community, as I know he does, and would be better
25  making viable contributions to that community than to spend a

1  lengthy sentence.  And Fred will talk about this also.

2       But Brock has had obstacles in his life, many of them,
3  I think more than other people, that left him frustrated and at
4  times bitter and angry.  He was adopted, as I've said, and so
5  there's always the feelings of abandonment by his birth
6  parents.  He saw his father and me get divorced at an age where
7  it was -- he was three.  And it's that age where the child
8  feels that it was his fault that we got the divorce, and in
9  actuality it was his father's fault, because he left Brock and
10  me.

11       Brock and I then moved to California, as I said, where
12  Brock became a part of a large family rather than being the
13  center of my attention.  And that was a hard adjustment for
14  him.  Then I became very ill and found out that I was in final
15  stages of renal failure.  I became -- kidney transplant in
16  1990, and I feel Brock was worried again, even though he didn't
17  show it at that time, because that -- his age, you don't show
18  those things -- that he would lose me and then again be
19  abandoned.

20       But even with all of these happenings, Brock worked
21  hard to excel rather than giving up and thinking nobody cared
22  about him.  But even though he really wanted to excel -- and he
23  made us very proud.  And these are some of his accomplishments.
24  Was tested and then identified as gifted and talented in the
25  sixth grade.  Started guitar lessons at a very young age and

1  became a remarkable player at a very young age.  He first
2  started with acoustic guitar.  His instructor said, "You've
3  learned as much as I can instruct.  Go find another person to
4  help you."  And so then he went on to the electric guitar and
5  became very, very successful.

6          He did exceptionally well academically throughout
7  middle and high school.  The teachers loved him.  He would
8  always get on his report cards, "pleasure to have in class."

9          He became a member of the drum corps at Mt. Carmel, one
10  of the most prestigious marching bands in Southern California.
11  And it was difficult to get in that, and he was so proud and he
12  worked so hard to accomplish that.

13          He established friendships easily and maintained them.
14  To this day, he's maintained many friendships that he
15  established back then.  Received a scholarship to Berkeley
16  College of Music in Boston.  Brock was one of 10 selected out
17  of many from numerous states who attended Berkeley in L.A.
18  week-long camp the summer of 1993.

19          When attending Metro State in Denver, majoring in
20  computer systems management, he was taking 17 to 19 credits per
21  semester, working full-time, and still maintained excellent
22  grades.  In fact, he was invited and initiated into the Sigma
23  Beta Delta Honor Society for business majors.

24          He is very goal-oriented.  When he and a fellow friend,
25  Rob Fulton, started the school -- Denver School of Music, I

1  just didn't think it was a good idea.  The place where they
2  decided to locate the school, I thought, you need to look at
3  demographics.  It wasn't a real wealthy area where people could
4  afford to send their children for lessons.  But they went and
5  they set long-term goals and short-term objectives and they
6  reached all of those ahead of when they thought they would be
7  at that point.  And it took a lot of hard work on Brock's part
8  to do that.

9        Brock's desire to be the best music teacher and
10  musician he could be surpassed his desire to be rich.  And that
11  hasn't always been the case.  Brock has just done a wonderful
12  job of -- because he always asked why we were teachers, you
13  know, we could go out and make more money somewhere else, but
14  we'd say that we like the job, and that meant a whole lot.  And
15  he didn't understand that until he went into the School of
16  Music, and he loves teaching and loved music.  So it was very
17  rewarding to see that he wasn't so into material things.

18        Brock is kind, funny, bright, and has a multitude of
19  friends who genuinely like him.  Even now, they support Brock
20  because they know Brock loved Ms. Doe and that he did not have
21  ill intentions in this relationship.  They would have accepted
22  Ms. Doe even though there was a considerable age difference.
23  And I know that it's been talked about, the discrepancy and
24  everything earlier, but Brock sits at the beginning of
25  Generation Y -- you know, he's like between X and Y.  And Ms.

1  Doe is definitely in the Generation Y.

2        Generation Y has been discovered to be the least biased

3  of any generations in the past.  They see no difference between

4  race, religion, ethnicity, and age.  Everybody is on the same

5  plane.  Also, they do not show a difference in your position.

6  You may be the low man on the totem pole or the high, but they

7  are -- everybody is on the same plane.  So it doesn't surprise

8  me that his friends, because they're probably Generation Y

9  people, most of them, would accept Ms. Doe, even if -- the

10 considerable age difference.

11       We enjoy Brock's friends.  He brings them over to our

12 home, both male and female.  And when I've met Brock for lunch,

13 he brings a friend with him, and so we just have a good time

14 chatting.

15       He is extremely caring and displays a sincere concern

16 for family and friends.  In fact, Brock wrote -- has written us

17 many, many letters while he's been incarcerated.  And one of

18 them that shows his concern for me is:  "Mom, I'm very

19 concerned to hear you'll need another kidney transplant.  When

20 I get to SeaTac, I'll request to have blood taken so I can find

21 out what my blood type is.  If we're a match I'm more than

22 willing to share."  And that's good news to know, because the

23 waiting line is terrible if I would wait for a cadaveric donor.

24 But -- and that's a major commitment, to donate a kidney.

25       Let's see.  I know Brock is extremely remorseful for

1  his actions.  In the many letters that he's written to us, he
2  has written numerous times -- I just took this one -- "It's my
3  fault I'm in this situation and I know that.  It upsets me that
4  this has a bad to devastating effect on you, Ms. Doe, my
5  friends, Denver School of Music, and Ms. Doe's family."  And it
6  goes on to say, "The fact that you guys have not only stuck
7  with me but you've gone beyond the call of duty means so much
8  to me.  I'm sorry I'm such a screw-up.  After I started Denver
9  School of Music, I felt like my life was finally on track.  I
10  was doing something I loved, and I fell in love with the most
11  perfect girl I ever met, who I was going to marry and
12  eventually start a family with.  I wanted to make you guys so
13  proud, and now it's all gone.  I'm so sorry."

14        Just one second.  And as I said before, Judge, we love
15  Brock and we're here for him now, and we'll continue to be
16  there for him when he is released.  We will assist him in
17  obtaining counseling and we'll help him to get back to making
18  positive contributions to his community, which I know he can
19  do.

20        Through this whole eight months, and even before, when
21  I was teaching, I would keep these words with me.  It's the 12
22  words -- in 12 words.  The -- it hit right here:  Face the
23  worst -- and, boy, this has been the worst for us.  It even
24  outdoes my going through the kidney transplant situation.
25  Think the best -- and we are thinking the best.  We -- we're

1    thinking that you will understand and be lenient on Brock that

2    can some impact on his community.  Do the most -- and we have

3    done the most to help Brock and to help Mrs. Tatter with this

4    case and just to support Brock.  We've done the most we can do.

5    And the last part is leave the rest.  And I'm -- we're leaving

6    the rest to you, Judge, and I just hope that you understand

7    that Brock is a contributor.

8             And I have one other thing.  Being a teacher of special

9    education students, I had to work on behavior modification a

10   lot, on inappropriate choice, improper choices, and had to deal

11   with punishment.  And this I always had to keep in my mind, and

12   I hope you keep this in mind.

13            It is very important that any program -- any program

14   involving punishment is defined so that punishment is maximally

15   effective with the minimal amount of discomfort and harmful

16   side effects.  And I know that a long sentence -- a bright,

17   talented young man -- I have a feeling that it would have

18   devastating effects.  So please, Judge.  Thank you.

19            THE COURT:  Thank you, Mrs. Munoz.  Mr. Munoz.

20            MR. MUNOZ:  Your Honor -- excuse me.  My name is

21   Frederick Munoz.  I'm Brock Purviance's stepfather.  I've known

22   Brock since I met his mother more than 25 years ago.  I am a

23   high school teacher in Colorado.  I teach biology.  I have

24   taught in California for 24 years and I'm in my 13th year of

25   teaching in Colorado right now.

1    I'm here to tell you how Brock has changed over the
2  years.   When I first met five-year-old Brock, he was trying to
3  cope with the divorce of his adoptive parents.  In addition,
4  because he had moved to California from Wisconsin, he was being
5  displaced to a new and unfamiliar place.  And then when he --
6  my -- his mother and I married, we had to combine our families
7  and he had to deal with the fact he's no longer the only child.
8  He was a close sibling with three stepsiblings, and it took a
9  while for him to adjust to this.  Through his early teens, it
10  was kind of tough.  But eventually he did understand that he
11  couldn't change that situation.

12    When he was in his teen years, he was most happy when
13  he was with his friends and when he was playing his guitar.
14  I'm very thankful for his choice of friends in California and
15  recently in Colorado, because they have proven to be among the
16  best things that have ever happened to Brock.  They've strongly
17  supported him and helped him to realize how lucky was to have
18  parents who have stood by him and supported him through all his
19  difficulties.  They helped us to help Brock grow into a kind
20  and caring person.

21    In the last 10 years, I've seen a 180-degree change in
22  Brock's life.  Used to be what I would say definitely a selfish
23  person and a taker.  But I'd have to say now he's one of the
24  most caring and giving persons I know.

25    After going to college for several months, he decided

A & T TRANSCRIPTS
(817) 685-7556

1  he didn't need to have a degree to be a successful performing
2  musician, which was his one-time goal.  So he quit school and
3  took several jobs, including several that were entry-level
4  management positions, when he realized he couldn't succeed at
5  what he wanted to be if he didn't have a degree.

6        Brock is very intelligent.  He has made mistakes in the
7  past and he's learned from those mistakes, even though some of
8  those were very difficult mistakes to have to correct.  He did
9  what was necessary to correct his mistakes.  And realizing that
10  dropping out of college was the wrong thing, he went back to
11  get a degree.  And now -- excuse me -- as my wife pointed out,
12  he was taking 17 to 19 credits a semester for several
13  semesters, including summer session, working full-time and
14  earning top grades in -- over 3.5 GPA.  He graduated in
15  December of 2001 with a degree in management.

16        In the little free time he had, he honed his musical
17  skills and became an excellent performer and a composer.  And
18  he is, I'd say, one of the best musicians I've seen.  When I
19  watch people on TV perform, and I'm thinking, Brock can do
20  that; Brock can do better than that.  And they're making a
21  living and are famous for what they do.

22        All along the way, somehow, he found that helping
23  people was more satisfying than becoming rich.  One of his
24  friends recruited him to become a mortgage broker when interest
25  rates on loans dropped considerably several years back.  He

1  helped people refinance loans to a lower interest rate to help
2  them save money.  Yet he saw that if a person would not benefit
3  by refinancing, he would advise them not to do so, even though
4  it cost him a commission.  He was more concerned with doing
5  right than making a profit on the situation.

6  He has always enjoyed sharing his love of music with
7  everyone.  He loved playing for them, but he really loved
8  teaching music.  And so he and a friend started a school, the
9  Denver School of Music.  As a music teacher, he blossomed, I'd
10  say.  He continually just illustrated his desire to help other
11  people.  He showed great patience with students who were
12  struggling.  He wrote all the curriculum for the school and
13  also wrote individual curriculum for students who were having
14  the need for personal help.  Didn't charge extra for this, even
15  though it cost him a lot more in time.  He gave free lessons to
16  students who thought about dropping out because of financial
17  hardship.

18  He organized and conducted or led several recitals for
19  his students, so they could demonstrate their accomplishments
20  to their friends, their family, and to the community.  We
21  attended one of these recitals after seeing that earlier one
22  that he had had put on a DVD so parents could share it with
23  other people.  And as we were there, we had -- heard nothing
24  but praise for Brock's efforts and work with their students.
25  And afterwards, he told us, you know, most of his

1  friends were making a lot more money than he was, but he saw
2  how much they were having to stress out at the job.  And even
3  though they were wealthier, he was happier.  And he was glad he
4  chose the direction he did.

5       He is now always one of the very first people to
6  volunteer to help us or his friends when help was needed.  And
7  he's made tremendous positive progress with his life, and is a
8  person whose company I really enjoy.  When he was a teenager, I
9  could not imagine myself saying that.  But he's a totally
10 different person than he was then, and he's someone I'm proud
11 of.

12      I say again that Brock learns from his mistakes.  He's
13 a person who can and has contributed much to the community and
14 he is a good person.  When Brock is released from custody, his
15 mother and I will stand by, we'll support him, we'll seek
16 counseling for him, and we'll help him to again become a
17 contributor to the community, which -- because he has so much
18 to give.  We'll be there for him, sir.  Thank you.

19      THE COURT:  Thank you, Mr. Munoz.  I believe the
20 parents of the victim would like to speak.

21      K.H.:  Your Honor, I'm K.H.  I'm the mother of the
22 victim.  And I'd like to rattle off a lot of pedigrees for my
23 husband and I and certificates and diplomas and stuff, but my
24 husband and I are pretty much average people.  We are both
25 working.  We take care of our children; we have four children.

1   And -- I'm very nervous, so if you'll bear with me, I'd like to
2   read my statement.

3           On December of 2005, I personally spoke with Brock.
4   When I thought -- I thought that if I spoke to him and
5   convinced him of the damage he was causing, he would go away.
6   Part of me even thought he would apologize and tell me he
7   didn't know how old my daughter was.  But I was not prepared
8   for how insidious he was.  Brock stated -- our conversation by
9   saying, "I can call you Kim, because you and I are going to get
10  to know each other very well."  My remark to him was, "You're a
11  pedophile, and you may call me Mrs. Huseman, because you will
12  not get to know me very well."  He laughed.

13          He told me that I was the one causing my child harm and
14  pain and I should allow myself to see that she was in love with
15  him, and that my husband and I were the ones that were making
16  her unhappy.  He told me if I really loved my daughter, that I
17  would basically open my arms to him and give him my daughter.

18          During the conversation, he said I was making a bigger
19  deal of the HPV which he infected her with than was necessary.
20  And since our family health insurance -- and 70 percent of the
21  population has HPV, I shouldn't be trying to scare my daughter
22  into thinking that it's more dangerous than it is.  Even though
23  I was in the doctor's office when the doctor gave the test
24  results to my daughter and I, I found myself doubting my
25  knowledge of what the doctor said.

1    Brock offered me money by saying he knew our family was
2    struggling financially, and would help pay for Jennifer's
3    upkeep and my husband and I to go out on dates.  And he laughed
4    again, like he was doing us a big favor.  By the time I got off
5    the phone, I wasn't sure if I should give Brock my daughter,
6    buy the plane ticket and hand-delivering him -- to Brock.

7    Brock said I had 18 months, and my daughter would be
8    his, and she would be 17 years old.  I was confused, I was
9    scared, and I felt threatened.  The thought of losing my child
10   was more than I could stand.  I kept thinking, maybe Brock was
11   right.  If my daughter was with him, at least I would know
12   where she was at.

13   This caused many problems between my husband and I at
14   that time.  So I made an appointment with a counselor for
15   myself.  I told her about the conversation I had with Brock.
16   After a few minutes, she said, "Listen to what you just said.
17   Give your child to a sexual predator.  If a mature woman like
18   you and a mother can be manipulated by this man, what chance
19   does your child have?"

20   In February, I spoke to one of Brock's other victims.
21   As she told me her story, the similarities were like reliving
22   our nightmare.  The difference was, her mother did give her the
23   money and the plane ticket and the consent to move in with
24   Brock when she was 17.  Because the age of consent in Colorado
25   is 17, which is what Brock clarified on the phone, when I

1   thought it was 18.  I can't believe I almost did the same

2   thing.

3        Brock will use whatever means he can to get what he

4   wants, even if it means using other young people connected to

5   the victim, such as my daughter's friends.  He used one for her

6   cell phone, so that my daughter could use the phone during

7   lunch hours at school.  He used another one for her address, to

8   send gifts to.  And then he used a third one to get messages to

9   her through the Internet.  And at the time, all three of these

10  girls -- and currently -- are underage.  The night I walked in

11  and found my daughter talking to him on the cell phone will

12  haunt my thoughts for a very long time.

13       Your Honor, Brock is a child sexual predator, with the

14  uncanny ability to detect the vulnerabilities in his victim and

15  her family and play on them.  I am very ashamed to say I almost

16  fell for his smooth words, hook, line, and sinker.

17       The crime that Brock has been convicted of carries a

18  maximum sentence of 30 years.  I am asking that you give Brock

19  the maximum time allowed.  He has proven he has been a danger

20  to society for a very long time.  The fact that he has not been

21  brought to trial before this time proves how dangerous he is.

22       If Brock is sentenced to 57 to 71 months, which has

23  been suggested for what he has done to my daughter, he will be

24  back into society by the time he's 35, which is still an age

25  that is a threat for young girls who are the age of his

1   previous victims.  With the minimum sentence of 12 years, which

2   is the same 12 years he has been pursuing children, he would be

3   about 40, at the age of -- when the young girls his victim's

4   age -- and they would be less inclined to be entrapped by him.

5        I have spoken to Brock on two occasions, and I have no

6   doubt in my mind and in my heart, when he was released, he will

7   continue this behavior.  Because he is convinced that society

8   in general has no right to tell him what is right or wrong.  He

9   will decide and has by his actions over the past 12 years

10  proven this.

11       For Brock, one day his sentence will end.  For my

12  child, Brock has sentenced her to a lifetime of repercussions.

13  HPV carries a life sentence with possibly horrendous

14  repercussions:  cervical cancer.  She will have to be vigilant

15  in her medical checkups, regardless of whether she has

16  insurance or the finances to do so.  Even with the new vaccine,

17  it will not prevent her from getting the cancer markers which

18  Brock has already infected her with, only the ones that she

19  hasn't.  And out of the four markers, she has three.

20       It is like playing Russian roulette, wondering

21  constantly.  The mental, emotional and physical abuse of what

22  Brock has done will be a lifelong battle for my daughter.  She

23  will have to learn to trust whether she is making good choices,

24  and still has yet to understand the destructiveness of

25  unhealthy relationships.

1    My husband and I and our family, we share her worries,
2  her doubts, her anxieties and pain.  And we will be here
3  whenever she needs us.  But it won't change the fact of what
4  Brock Purviance has done in our lives, with the undeniable
5  worry, anxiety, and pain.  We can't change what Brock has done,
6  but we can stop him from adding more victims to a list that's
7  already extensive.

8    Thirty years would ensure Brock wouldn't create any
9  other victims.  Twelve years would give his current victims the
10  one thing he didn't give them, which is time.  Time to grow up,
11  time to mature without further damage, and time to heal.

12    The one thing the defense has brought up is about her
13  intelligence.  My daughter is very bright.  But I would have
14  the Court remember that intelligence doesn't equal maturity.
15  You could have a six-year-old with a genius IQ; doesn't make
16  the six-year-old an adult.

17    At the time that Brock started with my child, I was
18  going through major surgeries myself.  At that time they
19  thought I had ovarian cancer and they thought I might die.
20  This is the time that Brock started speaking to my daughter.
21  During the second time that he actually flew to Alaska, I had
22  my second surgery and my grandmother died.  He used this time
23  to use -- to manipulate my daughter into meeting with him.

24    I'm sorry.  And as for the defense saying that we did
25  not have a confrontation before she came -- he came up here the

1  first time in 2004, that's not correct.  My daughter used
2  exactly the means in which Brock told her to do, which I didn't
3  know about until the second hearing.  When I heard the words
4  that he made -- he told her in the e-mail, it made sense to me
5  then what she was saying to me.  Because I couldn't understand
6  where this was coming from.

7      But you're right, I did allow her to stay with her
8  friends and her family.  I called the parent.  I made sure the
9  parents would be present.  And it was a bad decision.  We
10 should have left her with our family.

11     I ask you, Your Honor, to look at the defendant.  Does
12 he look like he's sad?  Does he look like he's sorry?  Because,
13 Your Honor, the person I spoke to on the phone had no remorse.
14 And if I didn't give him what he wanted, he told me he would
15 take what he wanted.  And I would ask that you remember that
16 Brock Purviance has had the successful part of his life.  For
17 my daughter, she's not going to have that.  And if the HPV
18 turns out to be the worst, is he going to be there when she
19 dies of cervical cancer?  And I know that's not the end result,
20 but it is a possibility.  That's the doubts that my child will
21 have to live with the rest of her life, and so will her father
22 and I.  Thank you.

23     THE COURT:  Thank you, ma'am.

24     K.H.:  My name's Kevin.  Obviously the father.  I
25 wasn't going to make a speech, but I feel I have to.  I see

1   Brock is definitely a very intellectual, goal-orientated
2   individual, very talented. Computer management, strives for
3   business skills -- all to not better himself or his
4   community -- I should say better himself, not the community.

5        I wish I would have -- I can't go into the technical
6   side of the means I tried to stop. Every phone I had locked in
7   the tool chest. Proxy servers, ICE (ph) servers, every means,
8   tracking, key loggers. I ask, how many of the individuals here
9   would go to those means with your family members, cousins,
10  daughters, to stop somebody like this? Wouldn't know how to.

11       I just ask that you take in consideration his skill
12  set. Obviously teaching other people as a professional -- I
13  don't see that as a professional I'd want teaching and molding
14  my child. And that's what I'm see -- he's already done. He's
15  taken upon himself to do this.

16       I just -- I can't emphasize the means we've tried to
17  stop somebody and his diligence in trying to take control of
18  the situation that I don't even see as a mature decision. I
19  see no maturity about it whatsoever. And, like I said, this
20  was totally unprepared, but feel I had to speak my mind on my
21  thoughts and feelings.

22       THE COURT: Thank you, sir. Before I neglect to do it,
23  we'll have the other exhibit that Ms. Renschen gave me marked
24  as Exhibit 2, and that'll be -- later the lawyers can get the
25  appropriate exhibit stickers on them. I've put a temporary

1  sticker on it.

2      All right.  At this point then, I need to hear from the
3  lawyers before I hear from the defendant.  And I'll hear from
4  you first, Ms. Tatter, regarding what you think might be an
5  appropriate sentence in the circumstances of this case, and I'd
6  particularly like to hear if you have any comments or
7  objections to the suggested special conditions of supervision.
8  Ms. Tatter.

9      MS. TATTER:  Judge, I'd first like to address the
10 guideline range.  And I think that there's been a lot of
11 thought in the commission going into this crime.  The Court
12 enhanced it for some of the concerns that the parents expressed
13 today of the influence over the child over a period of time.
14 So given the Sentencing Commission, the guideline range is 57
15 to 71 months.  And I think the Court should sentence in the
16 guideline range and not do what the prosecuting -- suggested of
17 going above the guideline range in essentially a departure,
18 because of what she perceives to be behavior traits of Mr.
19 Purviance.

20      The -- there is a great deal of discretion given by
21 Congress to the Court in this -- in supervised release.  And
22 the Court could keep him on supervised release forever.  The
23 guideline range is three to five years.  I think if the Court
24 sentenced something like five to seven years, that would be
25 reasonable and close to the guideline range.  I don't think

1   there -- just because the Court has discretion, it should go
2   with eternal supervision for Mr. Purviance.  Certainly all the
3   conditions about employment, computers, and the -- I'm not
4   contesting those.  I think some of them are required by law.

5         And I think the Court can say that guideline range is
6   appropriate because I have these other tools to supervise the
7   defendant and they are very mighty tools, the biggest one being
8   I think the sexual offender registry, which means that a lot of
9   schools, a lot of programs, a lot of landlords, Wal-Mart, many
10  places will be closed to him in the future because of the
11  sexual offender registry that's accessible to anybody on the
12  web.  He's going to have very severe sanctions, and I think the
13  Court needs to think about balancing those sanctions with a
14  jail time that might be more -- greater than necessary under
15  the statute.

16        The prosecutor really is trying to negate the effect of
17  Mr. Purviance's acceptance of responsibility.  He's getting a
18  sentence above the guideline range that he would have gotten if
19  he had gone to trial.  And she's saying the reason for this 84-
20  month recommendation is because he's an Internet predator who
21  has other victims.  And I think it's very -- Dateline and Cyber
22  Angels and everybody's interested in this topic.  But I think
23  the Court has to fine tune this evidence and check what's here.
24        I don't agree with the presentence report writer, who
25  says the defendant has a pattern of talking to minors about sex

1   and having sex with them.  The minor's mother had a website,
2   and if you Google Brock Purviance anywhere in the world, you're
3   going to find out about him.  And this has been up there for
4   six or eight months, and in fact, Tricia Walker contacted --
5   and she's the only one.

6       And I -- I'd like to address her.  I don't think she
7   fits in a pattern of preying on children and being an Internet
8   predator.  When they got together, she was 17 and he was 21.
9   This wasn't secret.  Her parents approved.  There was no
10  clandestine behavior.  They lived together, they were engaged.
11  He went to her parents' house and she went to his parents'
12  house.

13      It just -- although they initially met on the Internet,
14  as I'm sure hundreds of people do -- I'm sure the minor in this
15  case is meeting people in My Space as we speak.  But the fact
16  that she met him on the Internet doesn't mean -- in a chat
17  room -- doesn't mean that he -- that she fits in a pattern.
18  They were very close in age, and there was no clandestine
19  behavior.  C.A. claims that she met him when she was 14,
20  although the documentation of the sexual relationship in that
21  letter is when she was almost 20 in 2005.

22      I don't think -- and certainly what happened with the
23  minor here was unlawful, it was illegal sex, it was sex that
24  had a medical consequence.  It was improper.  And certainly the
25  Court should sentence for this offense, and I note that it's

1  already enhanced for the behavior situation.

2          If the Court goes above the range, as the prosecutor

3  wants, I think that's saying there's something extraordinary

4  here.  I think extraordinary is the Joe Bone (ph) case, who got

5  11 years for a situation of repeated 13- and 14-year-olds

6  getting crack for sex.  This is a single incident and an

7  allegation of another incident in a pretty stable, healthy

8  lifestyle, a life that can be reformed and reconstituted with

9  counseling that his parents will obtain.

10          I don't think the Court can say he's an Internet

11 predator, this is a pattern.  There's an allegation of one

12 other person that's in spite of this website where people could

13 report.

14          I believe my client is very misguided.  I think he

15 truly fell in love with this young woman.  She's very pretty.

16 The pictures show that.  She's very romantic-looking, she's

17 very clever.  I think this was dumb.  He had other friends.  He

18 had other opportunities.  I don't think he planned to prey on

19 her.  I think he genuinely fell in love.  He used stupid

20 judgment, he caused problems, but he caused problems that the

21 guidelines address with this fairly strict sentence where the

22 enhancement takes into account the unpleasant aspects of this

23 sexual innuendo and directions in the e-mail.

24          I think he has a healthy lifestyle.  I think he can

25 play music.  He -- his friends indicate they do social things

1  together.  He's not somebody who needs to stay on the Internet

2  preying on people.  It just didn't occur.  If you look at the

3  e-mails in this case, I think you can see he genuinely loved

4  this young woman.  It was very stupid and it was illegal, but I

5  think it wasn't malicious.  It was -- and I think he can be

6  supervised, he can be reconstituted, he can be reformed by

7  supervised release.

8           What the prosecution's doing by -- in a guilty plea,

9  recommending above the guideline range, is sending a message in

10  other cases.  It's good for the victims not to have to go to

11  trial in these cases.  But if my client in this case gets a

12  sentence approaching the people who go to trial with multiple

13  victims, I think that will encourage other lawyers to tell

14  their clients, you have nothing to lose, to just go to trial.

15  And I think it's good that the parents cared for this child and

16  kept her out of the courtroom.  And I think the prosecutor

17  should be interested in that in the future.

18           This case deserves jail time.  It -- Congress treated

19  it very seriously.  The sentencing guidelines treated it very

20  seriously.  It doesn't have a lot of ugly overtones or

21  compulsions.  I think a mid-guideline range is appropriate.

22  More than that is greater than necessary in violation of the

23  harsh sanctions the Court has with supervised release.  And it

24  sends a very bad message to future cases.  So I'd ask the Court

25  for something like 57 or 60 months.  I think that's appropriate

1  and very harsh.

2      THE COURT:  Thank you, Ms. Tatter.  Ms. Renschen.

3      MS. RENSCHEN:  Your Honor, one thing I agree with Ms.

4  Tatter on is that Congress does take these crimes very

5  seriously, and the sentencing guidelines take them very

6  seriously.  In fact, Mr. Purviance benefitted from being able

7  to be considered under the old sentencing guidelines that were

8  effective in November of 2003.  Today, were he to be before the

9  Court for a crime committed more recently, he would be in a

10  guideline range of 78 to 97 months.  That would be considering

11  acceptance of responsibility.  It would be more than that if he

12  had gone to trial.

13      I think it's very important that the Court look at

14  these facts and recognize them for what they are.  Mr.

15  Purviance is not a first-time offender.  He has met 14-year-

16  olds before on the Internet.  He has followed up on that

17  meeting with sex, in one case when the child had turned 17, in

18  another when the child was still 14, and in this case he met

19  the child at 13 and had sex with her just a week after she had

20  turned 15.

21      These situations are not -- they're not hard to figure

22  out.  This isn't a gray area.  A man who's 28 years old should

23  be able to see in very black-letter reasoning that you don't

24  seek out 14-year-olds.  And he does not understand that.  And

25  he has demonstrated repeatedly either that he doesn't

1    understand it or that he doesn't care.  And I think that his
2    conduct demonstrates the latter.
3         He was a master manipulator, demonstrated in a number
4    of ways.  The child's mother talked to you about how she felt
5    manipulated by this person.  The Court may recall from the
6    presentence report that when confronted by the Anchorage Police
7    Department, the defendant lied and said he hadn't been with
8    anybody, he hadn't met anybody, he didn't know Jane Doe.  When
9    the police confronted him again and said that they had evidence
10   that Jane Doe had used his cell phone to call, he said, "Oh, I
11   picked up a hitchhiker and I -- today was the first time I met
12   her.  That must have been the call."  He admitted to the
13   California police that he placed the knife against his own
14   wrist to scare and to frighten T.W. back in California.
15        He's professed love here to this 14-year-old child, and
16   after coming to Alaska twice to have sex with her, he then paid
17   for C.A. to travel to Colorado and have sex with her in October
18   of 2005.  So his actions certainly speak louder than his words.
19   And I don't think that -- although he may have told the child
20   he loved her, his conduct certainly didn't demonstrate that.
21        His attorney has asked that he have an opportunity to
22   reform and reconstitute.  But without acknowledging that he has
23   a problem, there's no chance of that.  Even his own mother got
24   up and tried to make a case for Generation Y, everybody being
25   on the same plane regardless of sex, religion, or age.  That's

1  simply wrong, and it's simply unlawful.  Congress has made it
2  ultimately clear that children need to be protected, and they
3  have taken steps, especially in light of how the Internet is
4  used and abused to manipulate children.  And we have a classic
5  example of it here.

6        You read just a few of the Internet conversations that
7  he had with the child and his manipulation in those
8  conversations are apparent.  He never once in there said,
9  "You're 14, we shouldn't do this."  It was always, "Well, I'll
10 do what you want, but I'd really like to do this."  And he
11 would influence her all over the place.  And he has done
12 nothing yet to take any responsibility for that.

13       We don't have a report here from a psychologist.  He
14 hasn't said, "I need to do something, I need to get help."  He
15 doesn't recognize the problem.  He didn't recognize the problem
16 after he got involved with T.W.  He didn't recognize the
17 problem after he got involved with C.A. when she was 14, and he
18 didn't recognize the problem with this child that he met when
19 she was 13.  That problem should have been clearer, and it's
20 not.  And I believe that it is his manipulation, it is himself
21 that he is putting above all.  And I think that that makes him
22 a real danger.

23       My belief was sealed when his family got up and spoke
24 about all of his talents.  This is a person who's talented in
25 music, he's intelligent, he's allegedly caring and giving.

1 He's got choices and opportunities that many people in life
2 don't have. And yet, rather than following through with those
3 things and pursuing them, he spends his time, hours and hours
4 and hours, on the Internet with 14-year-old girls. That is a
5 very serious problem, and it's one that the Court needs to
6 address.

7      And the Sentencing Guidelines, the Court has to impose
8 a sentence that reflects the seriousness of the offense, to
9 promote respect for the law, and to provide just punishment for
10 the offense, to afford adequate deterrence to criminal conduct,
11 to protect the public from further crimes of the defendant, and
12 to provide the defendant with needed educational or vocational
13 training, medical care, or other correctional treatment in the
14 most effective manner.

15      It is my belief that the Court has an obligation to
16 impose a sentence above the guideline range, above the 57 to 71
17 months. I am recommending a seven-year term, 84 months, for
18 this defendant. That period of time will give this child who
19 was victimized most recently an opportunity to grow into her
20 adulthood, to get away from him, to help her family get back
21 together and move on from the harms and dangers and the
22 victimization that they've experienced.

23      It's important that the Court keep in mind other
24 children as well. The fact that over the last 10 years the
25 defendant has never avoided 14-year-olds on the Internet but in

1  fact has embraced them indicates that he has a very long-term
2  problem, especially one that he doesn't seem to have
3  acknowledged yet.  That's going to take a long time to deal
4  with, and that's the reason that a long period of supervised
5  release is imperative.

6  I'm recommending a 25-year term.  The Court can go back
7  at any point and revisit it, but you can't put him on
8  supervised release now for three years and then find out in the
9  fourth year that he has a problem and go back and change that.
10 So to protect the children of our community, I'm asking the
11 Court to impose the 25-year term along with all of the
12 provisions that the presentence writer, Mr. Astle, included in
13 his report.

14 And, finally, I'm asking that the Court impose the
15 restitution amount of $2,605.  That is an amount intended to
16 cover both past expenses for medical treatment and counseling
17 as well as some future treatment.  The amount is very minimal
18 and took into consideration insurance payments and such, so
19 that this would be money that the family would be out of
20 pocket.  I believe that if the Court imposes a sentence such as
21 that, the eight years with the 25 years of supervised release
22 and the stringent conditions, that it will demonstrate that the
23 Court has really recognized the defendant for what he's done.

24 Counsel argued he's not an Internet predator.  I don't
25 think you can say that.  He's demonstrated through his conduct

1  that he is attracted to 14-year-olds, that he seeks them out on
2  the Internet and he pursues them.  You know, the first time he
3  waited until the child was 17, but he's gone downhill since
4  then.  The second victim was 14 when he snuck behind her
5  parents' back.  This child was 13 when he first contacted her,
6  had just turned 15 when he snuck behind these parents' back
7  when they went -- left town for a funeral.

8          If you look at that, I think it shows he has been a
9  predator and he's certainly taken advantage of his many talents
10  and used them not to benefit society, but to undermine the
11 community and to victimize children.  Thank you.

12         THE COURT:  Thank you, Ms. Renschen.  Mr. Purviance,
13 you have a right to speak before sentence is imposed.  If you
14 wish to speak, now is the time.

15         THE DEFENDANT:  Good morning, Your Honor.  While I was
16 incarcerated, I befriended a couple of gentlemen, fathers who
17 had teenage daughters that began dating older guys they met on
18 the Internet.  When the fathers found out what was going on,
19 they were furious and they sought quick and convenient justice.
20 One father broke the beau's nose; the other chased his
21 daughter's suitor away with a shotgun.

22         I want to think that my situation was different and
23 exceptional, but upon consideration, I realized the end result
24 was the same.  I violated a family and I caused discord.
25 Though I never intended to hurt anyone, because I'm not a

1 malicious person, hurting a family was the exact result of my
2 shortsighted selfishness. For that, I sincerely apologize to
3 the young woman and her family. I hope they're able to find
4 peace through forgiveness, heal, and move forward with their
5 lives.

6           I think it's important that the Court understand the
7 time context that this relationship happened. I was not in a
8 healthy state of mind. I'll give Audrey that in -- any second.
9 Your Honor, the young woman and I met during what was at the
10 time the most trying period of my life. I'd experienced quite
11 a bit of success as a loan officer in the refinance market. I
12 loved it, because I was able to help people understand and take
13 control of their finances. In addition, it afforded me a
14 beautiful house, a recording studio in my home, and a
15 comfortable lifestyle.

16           As I'm sure you'll recall, the market shifted abruptly
17 and drastically in the summer of 2003, when mortgage rates
18 climbed and the refinance market dried up. This is when I met
19 the young woman. During the year following our relationship --
20 excuse me -- during the following year, our relationship
21 developed from a friendship to a dating relationship. And
22 within that time frame, my savings were depleted. I lost my
23 house shortly after I returned from my August 2004 visit to
24 Alaska.

25           I switched careers and I started a music school, but

1  the income wasn't coming in fast enough for me to stop the
2  bills from getting out of control.  I was riddled with anxiety
3  and worry.  I began abusing alcohol and marijuana and I was a
4  depressed person.  My judgment was clearly inhibited.

5          To say I adored the young woman is an understatement.
6  She was the apple of my eye.  I wanted nothing more than to
7  spend the rest of my life with her.  She's a truly exceptional
8  and beautiful person and she's caring, creative, intelligent,
9  articulate, and genuine.  But it still wasn't right.  A friend
10 said it best:  I met the right person at the wrong time.

11         Beyond the trying time she came into my life, I think
12 the fact our relationship was predominantly not face to face
13 helped me maintain the illusion and fantasy that she was an
14 appropriate partner for me.  I taught many students around the
15 same age as her, and had she been one of my students, despite
16 all of her wonderful qualities, my interests would not have
17 gone beyond cultivating her talent.  I never would have crossed
18 that line.  Putting her person in that perspective helped me
19 realize how inappropriate and wrong my pursuing a relationship
20 with her was.

21         What makes this all the more painful for me is this
22 happened as I was realizing my biggest dream, by starting a
23 music school wherein I was able to enrich so many lives by
24 turning music from a simple hobby to a lifelong passion in a
25 day and age where arts and music programs are being cut from

1   school curriculums.  Seeing the smiles on my students' faces as

2   their family and friends cheered them on at recitals was an

3   incredible feeling.  I was helping them realize their dreams,

4   and now I feel that I've let them down.  Nonetheless, I

5   apologize to my family, friends, fellow teachers, and my

6   students.  I'm humbled by and thankful for their enduring

7   support and faith in me.

8        Your Honor, I've had a chance to come clean about

9   this -- what this case deals with, with my family, my friends,

10  not all of whom I was up front with in the beginning, and they

11  helped me understand how wrong what I did was.  I understand my

12  mistake now.  I see the pain and suffering that I caused.  And

13  that's not me.  I'm not the kind of person that would impose

14  that on anyone.  And if it were my daughter, I'm sure I would

15  feel the same as they do.  I used horrible judgment in pursuing

16  a relationship with a minor.  It will never happen again.

17       I'm a caring and capable person with a tremendous

18  support base, and I believe I still have a bright future ahead

19  of me.  I ask for your mercy and the opportunity to prove

20  myself so I may -- excuse me -- so I may pursue that future

21  sooner than later.  Thank you.

22       THE COURT:  Thank you, Mr. Purviance.  Well, as Ms.

23  Renschen mentioned, the statute that controls the exercise of

24  the Court's sentencing discretion contains a number of factors.

25  It's 18 United States Code Section 3553(a).

1          The first consideration is the nature and circumstances
2    of the offense and history and characteristics of the
3    defendant.  Certainly two different visions of the defendant
4    painted in the -- frankly in the presentence report itself as
5    well as in the comments that have been made about him.  I think
6    there's little doubt that he can be very manipulative.  I don't
7    doubt that he -- to some extent he -- while he was sincere in
8    his comments now, he was at least aware of the potential for
9    manipulation in them as he gave them.

10          I think he's probably manipulated his own parents into
11   seeing only the good side of him.  And, indeed, it troubles me
12   that so many of his friends who wrote letters apparently had no
13   idea of the other activities in which he engaged.  So, like all
14   of us, there's some good things about him and there's some bad
15   things about him.

16          The bad things about Mr. Purviance, though, are very
17   dangerous things, because they involve very vulnerable people.
18   They involve children.  And they involve children who -- whose
19   very childhood can be in effect eliminated, stolen, by the acts
20   of older people like Mr. Purviance.

21          Frankly, I think he's sufficiently narcissistic that he
22   probably looks at himself as being younger than he is, and
23   maybe in some way that tended to reinforce his belief that
24   there was nothing really wrong with what he was doing.  And yet
25   his comments to the victim's mother display not only a sense --

1   a lack of a understanding of what he was doing was wrong, but I

2   think he really didn't even care if it was wrong.  He had his

3   own view of what was right and what was wrong, and really it

4   was only his view that counted.

5       I do think he may have learned a number of things since

6   he's been incarcerated.  I think it probably was helpful for

7   him to have the conversations he's recounted with his friends,

8   and to force himself to look more objectively at his behavior.

9   Because when viewed objectively his behavior is deplorable,

10  it's despicable.  And yet, somehow, for all that time, he

11  managed to convince himself there was nothing wrong with it.

12      I can't speak about Gen Y or Gen X or the Great

13  Generation that Tom Brokaw talks about, or my own generation.

14  I can only look at people.  And perhaps people of an age such

15  as the victim here don't have any real standards and are unable

16  to choose between right and wrong; I hope that's not the case.

17  I don't really think it is the case.  But, any event, the Court

18  proceeds on the assumption that people do have the ability to

19  choose between right and wrong, and in this instance Mr.

20  Purviance chose wrongly.

21      So I think that the first consideration in the

22  circumstances of the offense and the history and

23  characteristics of the defendant all point to a sentence at or

24  above the guideline range.  I have to take into account the

25  need to deter further conduct by others like Mr. Purviance.  I

1  think that a sentence in the guideline range ought to be

2  sufficient to do that.  Anybody who realized that he might go

3  to jail for something on the order of six years should give

4  second thought that what he or she is about to do in terms of

5  taking advantage of a child.

6      It is necessary to protect the community from further

7  criminal behavior by the defendant himself.  Well, Ms. Renschen

8  is correct in suggesting that a long separation from society is

9  appropriate, but I think Ms. Tatter has something to say too,

10  which is that there is available to the Court a supervisory

11  tool which at least in federal court is a very serious one.

12  It's not as it may be in some state systems, where supervision

13  really amounts to making an occasional telephone call.

14      So by placing Mr. Purvance on a long period of

15  supervised release, we can effectively accommodate the need to

16  protect society from his behavior.  And if during the years, as

17  they go by, his -- he's able to demonstrate that he really has

18  reformed himself, why, then a long period of supervision might

19  be terminated early.  But we're not there yet and we may never

20  be.  But the point is that a long period of supervision will

21  protect people like the victim here and others from behavior

22  that got Mr. Purvance into the situation he's in now.

23      I need to take into account the need to provide the

24  defendant with the necessary vocational, medical, other

25  training.  He's a well-educated man.  Basically he just needs

1   some counseling with respect to his choices in life and he can
2   get that both in prison and during supervised release.

3           I'm directed to impose a sentence that is -- adequately
4   recognizes the seriousness of the crime and imposes just
5   punishment.  Again, I think a sentence in the guideline range
6   should be adequate to do that, because after all, the
7   guidelines were formulated with the intention of achieving
8   objectives just such as that.

9           I'm also directed by Congress to consider the
10  guidelines themselves, and we've established here that the
11  guidelines are 51 to 70 -- 57 to 71 months.  That's an advisory
12  range.  It's not binding on the Court, but I am to consider
13  them and I have established what the range is.

14          I'm to avoid unwarranted sentencing disparities among
15  people who are similarly situated.  And ordinarily an
16  imposition of a sentence within the guideline range will
17  accomplish that congressional objective for the reason that the
18  guidelines are the one thing that U.S. district judges across
19  the country do consider when a sentence is imposed.

20          Ms. Tatter is correct to say that I also am required by
21  the statute to impose a sentence that's sufficient, but no
22  greater than necessary, to accomplish all of the objectives
23  that Congress has set forth.  In this instance, I think a
24  sentence at the top of the guideline range is sufficient but no
25  more than necessary to do that.

1          Ms. Renschen's argument for a stiffer sentence is an
2   appealing one.  And many of the facts she points to would
3   probably support a sentence that's greater than that.  But I
4   think, when I take into account the period of supervision that
5   I'm going to impose and look at the directive from Congress
6   that a sentence be sufficient but no greater than necessary, I
7   can't justify a sentence above the high end of the guideline
8   range.  So, taking all of those factors into account, I think a
9   sentence of 71 months with a period of supervised release of 25
10  years is an appropriate sentence.
11  11:33:30
12       (Remainder not requested)
13  11:40:49
14       (Proceedings concluded at 11:40 p.m.)
15
16
17
18
19
20
21
22
23
24
25

1                          CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
3    entitled matter.

4    _Teresa K. Combs_____    _11/26/07_____

5    Teresa K. Combs, Transcriber          Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25